USA v. Groysman

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2013

(Argued: February 19, 2014          Decided: September 3, 2014)

Docket No. 13-1031

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

LYUBOV GROYSMAN,

Defendant-Appellant.

_____

Before: KEARSE, WINTER, and WESLEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Sterling Johnson, Jr., Judge, convicting defendant of conspiring to commit health care fraud, see 18 U.S.C. § 1349, and to engage in money laundering, see 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), and 1956(a)(1)(B)(i). Defendant contends principally that the government's main witness was allowed to give testimony that included inadmissible hearsay and inadmissible opinions, and to lay the foundation, without personal knowledge, for the admission of government charts that were inadmissible, inaccurate, and misleading. The government concedes these errors but contends that they either were harmless or were not so harmful as to meet the standard for plain error.

Vacated and remanded for a new trial.

MICHAEL H. WARREN, Assistant United States Attorney, Brooklyn, New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Amy Busa, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

MAURICE H. SERCARZ, New York, New York (Sercarz & Riopelle, New York, New York), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Lyubov Groysman (or "Groysman" or "Lyubov") appeals from a judgment entered in the United States District Court for the Eastern District of New York, following a jury trial before Sterling Johnson, Jr., Judge, convicting her of conspiring to commit health care fraud, in violation of 18 U.S.C. § 1349, and conspiring to commit money laundering, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), and 1956(a)(1)(B)(i). Groysman was sentenced principally to 97 months' imprisonment, to be followed by a three-year term of supervised release, and was ordered to forfeit $100,000. On appeal, she contends principally that the main government witness gave testimony that included inadmissible hearsay and inadmissible opinions, and was allowed, without personal knowledge, to provide the foundation for the admission of seven government exhibits ("GX") that were not admissible under the Federal Rules of Evidence and that were inaccurate and misleading. The government concedes these errors but contends that they either were harmless or were not so harmful as to meet the standard for plain error. Finding admission of the challenged exhibits and much of the main government witness's testimony seriously prejudicial error, we conclude that Groysman's conviction should be vacated and her case remanded for a new trial. In light of this decision, we need not reach other arguments made by Groysman on this appeal.

# I. BACKGROUND

The present prosecution arose out of an investigation by the Federal Bureau of Investigation ("FBI"), the Department of Homeland Security ("DHS"), the Internal Revenue Service ("IRS"), and the New York City Police Department ("NYPD") into schemes by suppliers of durable medical equipment (or "DME"), such as neck braces, knee supports, and bed boards prescribed for patients, to submit fraudulent reimbursement claims to insurance companies. In this type of scheme, a DME retailer would procure from a wholesaler an invoice that bore inflated prices for the listed equipment and give the wholesaler a check for the total; the retailer would bill an insurance company for the inflated total; and the wholesaler would return to the retailer part of the difference between the stated price and the actual amount paid by the retailer.

The government's investigation resulted in the June 2010 arrests and indictment of numerous persons, including Groysman. Groysman and one codefendant, Vladimir Khmelnitski, were tried together on the two-count indictment charging health care fraud conspiracy and money laundering conspiracy. At their 11-day trial, the government called nine witnesses whose testimony related to Groysman (or to the companies by which she was employed), including two cooperating witnesses (the "cooperators" or "informants"): Grigory Groysman (or "Grigory G."), who is not related to Lyubov Groysman, and Vadim Yuzovitskiy. The government's main witness was DHS Special Agent Semyon Ginzburg, who had run the latter stages of the investigation and who testified on the first four days of trial attended by the jury.

A. The Testimony of Special Agent Ginzburg

Agent Ginzburg testified that he became involved in the health care fraud investigation into DME companies in January 2010. Prior to his involvement, Grigory G. and Yuzovitskiy, DME wholesalers who had long been engaging in fraudulent schemes, had learned that a participant in their DME schemes had been arrested, and they had voluntarily surrendered to federal authorities and agreed to assist in the investigation. After Ginzburg became involved, he conducted a "street operation" by having the cooperators--monitored by himself and others--continue their dealings with suspects but with the goal of collecting evidence for the authorities.

All conversations on the cooperators' telephone lines were recorded. And initially, for face-to-face meetings with the suspects, the cooperators were outfitted with audio recording devices. Eventually, the cooperators were equipped with hidden cameras that provided video recordings with audio--although Ginzburg testified that the video aspect did "[n]ot [work] too well." (Trial Transcript ("Tr.") at 57-58.)

The conversations between cooperators and suspects were usually in Russian. (See, e.g., id. at 68.) Ginzburg testified that his native language was Russian; that he was raised in the former U.S.S.R. until he came to the United States at about age 18; that his primary language at home and in social situations has remained Russian; and that he had been trained to translate between Russian and English and had passed tests given by the FBI, NYPD, and DHS for such translations. (See id. at 38-39.) Ginzburg testified that he reviewed translations of the cooperators' conversations with the suspects, and he "personally transcribed at least the final transcriptions of . . . [the] meetings and telephone recordings." (Id. at 60.) At trial, the government introduced transcripts of recorded conversations between Groysman and Grigory G. or Yuzovitskiy, as well as videotapes of some of their meetings.

Groysman's position with respect to the charges against her was that she was merely a part-time worker at EGA Group, Inc. ("EGA"); that she helped with billing because she knew how to use the computer; and that she was not getting paid and was unaware of the DME fraudulent scheme. (See, e.g., id. at 314-15, 317 (Ginzburg's description of his postarrest interview of Groysman); see also Government brief on appeal at 4 ("At trial, Groysman's defense was that she was a part-time worker at EGA who had been following the direction of one of EGA's owners, Gregori [sic] Branfenbrener, without knowledge of the scheme or the criminal intent to participate in it.").)

Ginzburg's testimony at trial with respect to Groysman included the following. Groysman, along with codefendant Grigory Branfenbrener ("Branfenbrener") who had pleaded guilty prior to trial (see Government brief on appeal at 4 n.2), worked at two DME retail companies, first Leica Supply Inc. ("Leica"), and then EGA. Ginzburg testified that Groysman or Branfenbrener would give one of the cooperators a document that the government dubbed a "go-by" (see, e.g., Tr. 335; see also id. at 544 ("go-buy")). The go-by listed the types of equipment that EGA supposedly wanted to buy from the wholesaler, the quantity of each item, and a highly inflated price per item. For example, bed boards that cost $10-$12 were listed as costing $92; home whirlpools that cost $30-$32 were listed as costing $380. (See, e.g., id. at 223, 244-45.) Ginzburg instructed the cooperators to prepare invoices to match the information EGA provided in the go-bys.

The go-bys were generally accompanied or followed by EGA "checks [that] would come from Ms. Groysman and Gregory [sic] Branfenbrener." (Id. at 66.) The EGA checks were deposited into an account of one of the cooperators' fictitious wholesale companies, usually one named "Delazoom." Delazoom then issued a corresponding check to a shell company, and that check was cashed. After the check casher retained a small fee, all or most of the rest of the cash was divided

among the defendants and their retail companies and the cooperators. In some instances, a small portion of the money would be used to purchase equipment.

Ginzburg testified that he monitored the operation in part by meeting with the cooperators before and after their face-to-face meetings with the suspects (see Tr. 68), and by controlling the deposits of the checks, the withdrawal of cash, and the "delivery of the cash to the defendant" (id.). Ginzburg attended none of the cooperators' meetings at EGA and could not see through the windows. (See, e.g., id. at 195-96, 256.) The only witnesses who had "actual knowledge of what [Groysman] did" were "the informants" (id. at 356-57); Ginzburg's knowledge of what took place at those meetings came from what he could hear through the audio equipment, from what he learned by reviewing the recordings, and from "the debriefing of the informant[s]" (id. at 196).

Ginzburg testified that EGA would bill insurance companies for the items it claimed to have purchased at the prices shown on the invoices provided by the cooperators and that the insurance companies would then reimburse EGA for the DME. The government introduced a chart, GX 75, prepared at the direction of Ginzburg, that provided a general summary of the fraudulent health care scheme by giving a "visual description of the scheme that EGA was running with the informant" (Tr. 303). Circles on the chart contained the names or titles of relevant entities or documents, and arrows pointed from circle to circle to show the movements of documents and checks. As described by Ginzburg, GX 75 showed that "[t]he go bys were received predominantly from defendant Groysman to Delazoom. The false invoices were generated based on those go bys and brought back to the defendant Groysman." (Tr. 307.) Ginzburg testified that after Groysman gave the cooperators EGA checks payable to Delazoom, "the resulting cash would go back minus the kickback and minus any cost of DME predominantly to Grigory Branfenbrener and at least on one

occasion the defendant Groysman." (Id.) GX 75 also suggested that EGA's inflated claims to the insurers were paid as submitted. The exhibit was admitted in evidence over Groysman's objection that, inter alia, that suggestion was inaccurate and misleading.

Seven other exhibits introduced by the government, GX 59-65, were charts prepared at Ginzburg's direction to depict numerous meetings between Groysman and Yuzovitskiy or Grigory G., with boxes and arrows to show checks given to Yuzovitskiy or Grigory G. and cash flowing back to Groysman. Groysman's objection that these exhibits were improperly being used as actual evidence rather than for purely illustrative purposes was overruled. (See Tr. 104.) Most of these charts were admitted over Groysman's additional objections after her counsel elicited on voir dire that the charts were based on what the informants told Ginzburg, rather than on Ginzburg's personal knowledge or observations (see, e.g., id. at 195-98, 207-08, 233-35, 294-97). And certain of the charts were admitted over Groysman's objection that they were inaccurate or contained information that was misleading. (See id. at 251-53, 210-13.) Six of the charts indicated that after Groysman had given Yuzovitskiy or Grigory G. a go-by, cash was returned either to Groysman and Branfenbrener or just to Groysman. (See GX 59, 60, 61, 63, 64, 65.)

Ginzburg summarized Groysman's role in the DME scheme as follows:

> Q. Based on the street operation, based on the recorded meetings and telephone calls that you obtained and preserved in this investigation, what role did [Groysman] play in EGA office between January and June of 2010?

> A. She provided the go-buys for the false invoices, received false invoices based on those go-buys, provided checks and received cash at least once.

(Tr. 544.)

B.  Testimony by the Cooperators

Both cooperators testified at trial.  Grigory G. testified that he and Yuzovitskiy were partners operating fictitious DME wholesalers.  Grigory G. testified that Groysman and Khmelnitski--who, although being tried together, were not shown to have interacted with each other in the DME scheme--were "my partners in criminal activities.  We were doing money laundering and insurance fraud."  (Tr. 598.)

Grigory G. testified that EGA and Leica, the companies that employed Groysman, were retailer clients of Grigory G. and Yuzovitskiy in the DME scheme.  Grigory G. testified that he, either alone or with Yuzovitskiy, drove to the office of EGA or Leica dozens of times; however, usually Yuzovitskiy went into the office alone.  Grigory G. went into the EGA office only six or seven times.  When Grigory G. himself went in, "everything" he received with respect to the fictitious invoices came "from Lyubov Groysman" (id. at 659).

Grigory G. testified that when he returned cash to EGA, the amount returned was the amount of the check the cooperators had received from EGA minus five percent as the standard fee for the entity that cashed the check, a six percent fee for the cooperators, and the cost of DME actually supplied to EGA, if any.  (See id. at 608-09; see also id. at 734 (similar testimony by Yuzovitskiy as to the division of the scheme's proceeds).)  Thus, where no equipment was actually purchased, EGA would receive in cash 89 percent of the amount it had given a cooperator.

Grigory G. testified that on March 18, 2010, he returned such cash to Groysman.  The transcript of the audio portion of the recording on that day, translated from Russian and using "LG" for Groysman and "GG" for Grigory G., included the following:

GG: Take it.

LG: Thank you, uh-huh. Yes.

GG: It has this and that.

(GX 2-10, at 2.) At trial, Grigory G. explained this exchange as follows:

Q. What were you referring to when you said "and this and that"?

A. Invoice and cash.

Q. Do you recall what the purpose of the cash was?

A. It was the cash for the check that had been given prior to that.

(Tr. 664.)

Yuzovitskiy testified that his role in the scheme was to prepare the fictitious invoices for the retailers. For the information that was to be shown on those invoices for EGA, Yuzovitskiy received go-bys from Groysman. (See id. at 744, 959.) The fictitious invoices were then reviewed by Groysman, and errors were called to Yuzovitskiy's attention by Groysman. (See id. at 853-55; see also id. at 659, 663-64 (testimony by Grigory G. that Groysman also called such an error to his attention so that he could have Yuzovitskiy provide a corrected fictitious invoice).) Yuzovitskiy testified that the EGA checks corresponding to the go-bys, made out to one of the cooperators' wholesale companies, were signed by Branfenbrener "but Lyubov Groysman issued the check." (Id. at 745.)

Yuzovitskiy testified that he also "ha[d] discussions with Lyubov Groysman with regard to the cash deliveries that [he] would make to EGA and Leica"; he testified that "[s]he would ask me when the money will be coming." (Id. at 958-59.) However, Yuzovitskiy testified that "99 percent of the time" he delivered the cash to Branfenbrener. (Id. at 958.) Indeed, on questioning by the government, Yuzovitskiy testified that he did not remember ever giving cash to Groysman:

Q.  Did you ever, ever deliver cash to Lyubov Groysman?

A.  I don't remember if it ever happened.  But most of the time I would leave it in the drawer, in the Branfenbrener desk drawer.  But I don't remember that I gave cash directly to Lyubov.

(Tr. 958 (emphases added).)

Both Grigory G. and Yuzovitskiy testified that they had been involved in the DME schemes prior to voluntarily turning themselves in and agreeing to assist the government in the investigation that led to the present prosecution.  Grigory G. testified that he was currently awaiting sentencing for money laundering, insurance fraud, and tax evasion, having pleaded guilty to those charges.  He agreed to cooperate with the government in the present investigation and to be a witness at trial in hopes of getting a reduced sentence.  (See id. at 688.)  Yuzovitskiy similarly testified that he had turned himself in and decided to cooperate with the government because he was afraid that he was about to be arrested.  (See id. at 900-01.)  He too had pleaded guilty to money laundering, insurance fraud, and tax evasion and was awaiting sentencing.  He hoped, by his cooperation, to secure a lighter sentence.  (See id. at 902-03.)

Both cooperators also testified that they had been ensnared in a prior fraud investigation by New York State authorities and had cooperated with the authorities in that matter.  Grigory G. testified that he had been investigated by state authorities in 2004 and 2005; he had avoided prosecution by assisting in their investigation, including by recording conversations with his then-coconspirators.  (See id. at 688-89.)  Yuzovitskiy testified that he had participated in Grigory G.'s 2004-2005 frauds, and he too cooperated with the state authorities.  In exchange for that cooperation, neither Grigory G. nor Yuzovitskiy was arrested, charged, prosecuted, or required to make payments of back taxes.  (See id. at 897-99.)

Yuzovitskiy testified that as soon as that state investigation ended, he and Grigory G. resumed business as usual. They never went out of business. They just closed their old office and "continued doing fraud as [they] did before," "at a new address." (Id. at 898; see also id. at 622-23 (testimony by Grigory G. that he had started the criminal DME wholesale business in 2001, and it continued for nine years).) Yuzovitskiy testified that in all their operations together, he and Grigory G. never had any clients that were running "legitimate retail durable medical equipment companies." (Id. at 791.)

C. Other Government Witnesses

The government's other trial witnesses whose testimony related to EGA were an IRS special agent and an FBI special agent who had analyzed documents in connection with the health care fraud investigation; an IRS special agent who was involved in executing a search warrant at EGA's office; two investigators employed by insurance companies; and a DME wholesale distributor. None of these witnesses provided evidence about Groysman personally.

D. Groysman's Defense Case

Groysman called three witnesses in her defense, including two character witnesses. Her fact witness was Yelena Panchenko, a longtime friend who had been a coworker at EGA for six or seven months, beginning in 2009 and ending in June 2010 when the arrests occurred. Panchenko worked part-time at EGA as a clerk, doing billing.

Panchenko testified that Groysman was not an owner of EGA; "E" "G" and "A" were the initials of the first names of the three owners, including Grigory Branfenbrener. She testified that

Groysman, like Panchenko, was a clerk at EGA (see Tr. 1211), and she believed Groysman too worked part-time (see id. at 1210). Groysman "was doing the mail" (id. at 1209), sorting it and sometimes responding to insurance company requests for additional information (see id. at 1209-10).

Panchenko testified that one of EGA's suppliers was Yuzovitskiy and that the accuracy of the invoices they received from him was "[t]errible. . . . Every time they would bring up the invoice it was always mistake." (Id. at 1212.) Invoice errors made it difficult to receive reimbursement from the insurance companies. Panchenko testified that eventually, to address the problem with Yuzovitskiy's invoices, Branfenbrener "would dictate to us the names and quantities" for an order. (Id.) As to prices, Panchenko testified that "[e]verything was in the computer and the computer did it automatically." (Id. at 1270.)

Panchenko testified that on a few occasions Yuzovitskiy delivered a sealed envelope to EGA's offices; Panchenko would usually put it on Branfenbrener's desk. She never saw cash in an envelope and never saw Yuzovitskiy or Grigory G.--or any wholesaler--give cash to Branfenbrener or Groysman. (See id. at 1213-14.)

E. Summation and Verdict

In summation, the government argued that the evidence demonstrated that Groysman knowingly entered into and participated in the fraudulent scheme alleged. In discussing the testimony of the cooperating witnesses, the government stated in part as follows:

> We put on two cooperating witnesses. The government witnesses Grigory Groysman came first and then Vadim Yuzovitskiy.
>
> Now let's talk for a second about what those cooperators are not. They are not boy scouts. They are not altar boys. They're criminals. They are individuals who came forward to the government and identified themselves as

having been part of this scheme and as furthering this scheme and they wanted to cooperate, motivated in their own self interest of hoping to some day get leniency. They're not angels.

. . . .

. . . I said, you know, they weren't angels, but what they were and what they are was consistent, credible and corroborated.

I mean, they went into these meetings and they essentially operated as walking, talking, videographers. I mean, their video was no Steven Spielberg most of the time, but we have on tape documents that are incriminating, documents that are furthering the fraud, statements that are made by the defendants in furtherance of the fraud over and over and over again.

You can trust the testimony that came from Vadim Yuzovitskiy and Grigory Groysman because it was consistent and it was corroborated and every time they went into a meeting with one of the defendants, they met with an agent before they went in, they met with an agent when they came out and you heard from that agent. So you can trust that testimony.

(Tr. 1306-07 (emphases added).)

Groysman was convicted on both of the counts with which she was charged. She was sentenced as indicated above.

## II. DISCUSSION

On appeal, Groysman contends principally that Ginzburg's testimony was replete with inadmissible hearsay, as he recounted factual matter as to conduct by Groysman that he could not have learned except from statements by the cooperators; that Ginzburg was improperly allowed to give his opinion as to Groysman's culpability; that Ginzburg was allowed to give foundation testimony for the admission of documents as to whose accuracy he had no personal knowledge; and that seven charts introduced by the government showing go-bys from Groysman to Yuzovitskiy or

Grigory G.--six of which indicated cash was given by Yuzovitskiy or Grigory G. to Groysman--were not admissible under the Federal Rules of Evidence and were inaccurate and misleading. Groysman concedes that some of her present objections to Ginzburg's testimony or to those charts were not made at trial. She contends, however, that the errors to which she objected were not harmless and that those to which she did not previously object warrant reversal on the ground of plain error. We conclude that given the serious impropriety of the prosecution's use of this witness in light of the record as a whole, the evidentiary errors of which Groysman complains on appeal--which, along with others, are admitted by the government as described below--meet the standard for plain error review and require that Groysman be given a new trial.

Preliminarily, we note the principal differences between harmless-error analysis and plain-error analysis. In conducting harmless-error analysis, applicable when an error claimed on appeal has been properly preserved in the district court, we consider "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." United States v. Gomez, 617 F.3d 88, 95 (2d Cir. 2010) (internal quotation marks omitted). Conducting harmless-error analysis, we will reverse a conviction on the basis of improperly admitted evidence "only if [the] error affects a substantial right." United States v. Garcia, 413 F.3d 201, 210 (2d Cir. 2005) (internal quotation marks omitted). The Federal Rules of Criminal Procedure ("Criminal Rules") provide that any error "that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). "An evidentiary error affects substantial rights if it had a substantial and injurious effect or influence on the jury's verdict." United States v. Garcia, 413 F.3d at 210 (internal quotation marks omitted). "An error is harmless if we can conclude with fair

assurance that the evidence did not substantially influence the jury." Cameron v. City of New York, 598 F.3d 50, 61 (2d Cir. 2010) (internal quotation marks omitted). With respect to harmless-error analysis, the government bears the burden of proof. See, e.g., United States v. Kaiser, 609 F.3d 556, 573 (2d Cir. 2010).

The Criminal Rules also provide that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). Under this Rule,

> before an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

Johnson v. United States, 520 U.S. 461, 466-67 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993) (other internal quotation marks omitted)). An error affects substantial rights when it is prejudicial--that is, when there is a "reasonable probability" that the error affected the outcome of the trial. United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004). The burden of meeting the above criteria for plain-error review is on the defendant. See, e.g., id. at 82. The government may point to parts of the record in an effort to counter any ostensible showing of prejudice the defendant may make. See, e.g., United States v. Young, 470 U.S. 1, 16 (1985).

In the present case, given the numerous errors conceded by the government and the fact that not all of them were the subject of objections by Groysman at trial, we elect to bypass harmless-error analysis and to conduct only plain-error analysis notwithstanding that the burden under that analysis is on Groysman, because we conclude, on the present record as a whole, that she meets

- 15 -

the burden. The first two criteria for relief under the test for plain error are clearly met. There were errors and they were plain. The government in its brief on appeal concedes as follows:

> Groysman challenges three aspects of Agent Ginzburg's testimony: (1) Ginzburg's incorporation of hearsay from the cooperators who later testified at trial, (2) the inadequate foundation during his testimony for the admission of summary charts, and (3) Ginzburg's inappropriate opinion testimony relating to Groysman's role in the charged fraudulent scheme. . . . While Groysman is correct that the government improperly admitted [sic] several aspects of Ginzburg's testimony, ultimately, as explained below, any error in the admission of this testimony was harmless in light of the strength of the other evidence offered at trial.
>
> First, to the extent that Ginzburg described what occurred at meetings inside EGA offices, he was conveying information that he learned from debriefing the cooperators and was thus conveying inadmissible hearsay. Fed. R. Evid. 801(c)(1).
>
> Second, to the extent that Ginzburg interpreted recorded conversations involving the cooperators, Groysman and Branfenbrener, or opined upon Groysman's role in the charged conspiracy, he was providing inadmissible opinion testimony. United States v. Garcia, 413 F.3d 201, 210 (2d Cir. 2005); United States v. Grinage, 390 F.3d 746, 749-51 (2d Cir. 2004) (lay opinion); United States v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2003) (expert opinion).
>
> Further, as counsel properly objected to all but one of the charts below, to the extent that Ginzburg provided a foundation for the admission of Government Exhibits 59 through 65, he had no personal knowledge of many of the matters conveyed on those exhibits. Compounding the lack of foundation for the admission of the summary exhibits, as counsel had further objected below, the exhibits contained inaccurate and misleading information, further rendering them inadmissible. United States v. Citron, 783 F.2d 307, 316 (2d Cir. 1986).
>
> More fundamentally, however, these charts were not "summary charts" as contemplated by Fed. R. Evid. 1006. Government Exhibits 59 through 65 do not summarize "voluminous writings, recordings, or photographs." Id. Instead they appear to be pictorial representations of hearsay testimony offered through Agent Ginzburg and of events and transactions later described by the two cooperators. As such, the exhibits are no more admissible than any other extrinsic writing memorializing the substance of a witness's testimony.FN27.

27. In addition, although not raised in Groysman's brief, <u>it appears that GX 75, a chart that generally summarized the scheme, was erroneously admitted for similar reasons</u> and <u>was also inaccurate to the extent it suggested that all claims that were submitted by EGA were paid by insurance companies without any rejections or inquiries, as counsel had objected below</u>. (T 303-06). <u>Using GX 75</u>, Ginzburg described, without objection, a summary of the scheme, including opining that Groysman had provided the "go-bys" to Delazoom, which prepared false invoices on the basis of the "go-bys," which, in turn, were delivered to Groysman. (T 307). <u>Ginzburg further indicated that after the cooperators cashed the checks received from EGA, they returned the cash</u>, less their fee and expenses, primarily to Branfenbrener but <u>at least once to Groysman</u>. (T 307). While <u>this testimony improperly relayed hearsay from the cooperators</u>, it too was harmless for the reasons explained below.

Further, <u>these depictions may have also constituted a degree of improper bolstering</u> of the cooperators.

(Government brief on appeal at 41-43 & n.27 (emphases added).) "Groysman's complaints regarding the admission of the evidence challenged herein are well founded . . . ." (<u>Id</u>. at 51.)

The third plain-error analysis factor, whether the errors affected Groysman's substantial rights, <u>i.e.</u>, whether there is a reasonable probability that, absent the erroneously admitted evidence, the jury would not have found Groysman guilty, is not conceded by the government, but we conclude for the reasons that follow that that factor too is established. "The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." <u>Dominguez Benitez</u>, 542 U.S. at 83 n.9. "The question is not whether the defendant would more likely than not have received a different verdict . . . but whether . . . [despite the error] he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's [error] undermines confidence in the outcome of the trial." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

The government, in its brief on appeal, characterizes its trial evidence "excluding Ginzburg's testimony, []as strong, if not overwhelming." (Government brief on appeal at 45.) It argues that

> both cooperators directly implicated Groysman in the charged crimes and were corroborated by their contemporaneous consensual recordings and the documentary evidence reflecting the gross price disparities between the cost of the DME to EGA and the amount that EGA billed to the insurance companies,

(id.) and that "[t]hus, the 'inadmissible aspects of [Ginzburg's] testimony, viewed in relation to the prosecution's formidable array of admissible evidence, was merely corroborative and cumulative'" (id. (quoting United States v. Dukagjini, 326 F.3d 45, 62 (2d Cir. 2002))).

On the contrary, we find the government's entire strategy was dependent on, and tainted by, the egregious errors that the government now admits. These errors, discussed in more detail below, so infected the fairness of the trial that Groysman's conviction would have been overturned in all but perhaps the most airtight of cases. Specifically, the prosecution chose to lead with Ginzburg's testimony, which gave a coherent, and superficially reliable, narrative of the government's version of Groysman's participation in the fraudulent scheme. It was the equivalent of an opening argument or summation by the prosecution but was presented as evidence for the jury to consider. The charts, graphically displaying purported "facts" Ginzburg had "verified," compounded the error. With this in place, the jury was all but invited to fall asleep during the admissible but messy evidence of wrongdoing, i.e., the garbled audio-video evidence and credibility-challenged testimony of the cooperators.

Before delving into the individual weaknesses of the government's case, we issue a word of caution: The errors admitted to in this case bordered on the structural, and the government

- 18 -

should not hope to overcome similar lapses in the future by the marshalling of a slightly stronger case. See United States v. Yakobowicz, 427 F.3d 144, 150, 154 (2d Cir. 2005) (Interim summations that the prosecution used to "not only state[] what the particular witness . . . said but also argue[] the inferences to be drawn by the jury" constituted "a structural error requiring reversal."). Viewed in the context of the trial strategy as a whole, Ginzburg's testimony was used to essentially vouch for the admissible evidence offered by the prosecution. This tactic, whether engaged in by a prosecutor or other government agent, has been repeatedly condemned. See, e.g., United States v. Modica, 663 F.2d 1173, 1178-79 (2d Cir. 1981) ("This Court has repeatedly warned prosecutors not to vouch for their witnesses' truthfulness," and "[t]he policies underlying this proscription go to the heart of a fair trial. . . . [W]hen the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore his views, however biased and baseless they may in fact be."); United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998) ("Attorney statements vouching for the credibility of witnesses are generally improper because they 'impl[y] the existence of extraneous proof'" (quoting United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994))); United States v. Young, 745 F.2d 733, 766 (2d Cir. 1984) (Newman, J., concurring) (The "risk [of undue reliance on the testimony of a government agent] arises because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial. The risk is increased when the opinion is given by 'the very officers who were in charge of the investigation.'" (quoting United States v. Sette, 334 F.2d 267, 269 (2d Cir. 1964))); United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988) (A government investigator's testimony that was "based on his positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses" improperly "opine[d] as to the credibility of the testimony of other witnesses

at the trial." "The credibility of witnesses is exclusively for the determination by the jury . . . .").  The cumulative and strategic effect of the inadmissible evidence proffered by the government in this case, even separate from other, individual deficiencies, thus went to the heart of a fair trial.

From the outset of the prosecution, Groysman's claim was that she had merely been following instructions given by Branfenbrener, without knowing of or intending to participate in the fraudulent scheme.  As indicated in Part I.A. above, Ginzburg testified that Groysman took this position when he interviewed her following her arrest.  At trial, Groysman's attorney's opening statement argued that the invoices were erroneous "unbeknownst to [Groysman]" (Tr. 23) and that there would be no evidence that Groysman "received money or saw money being exchanged" (id. at 25).  And as set out in Part I.D. above, Groysman called as a witness Panchenko, who worked part-time at EGA during the entire period of Ginzburg's street operation and who testified that the details on the lists that EGA gave Yuzovitskiy for his preparation of invoices were dictated by Branfenbrener.  Thus, the government set out to prove that Groysman was a knowing participant in the fraudulent scheme by, in part, presenting evidence that she received cash kickbacks.  Most of the evidence that the government caused to be admitted for this purpose was inadmissible; and, as discussed below, the single bit of admissible direct evidence that Groysman received such a cash kickback--testimony by Grigory G.--was not corroborated.

The government began by having Ginzburg testify, implicitly and explicitly, that Groysman received such cash.  (See, e.g., Tr. 68 (Ginzburg's testimony that he monitored the street operation by controlling, inter alia, "delivery of the cash to the defendant"); id. at 307 ("the resulting cash would go back minus the kickback and minus any cost of DME . . . to . . . at least on one occasion the defendant Groysman"); id. at 544 ("She . . . received cash at least once.").)  Ginzburg,

however, had no personal knowledge of "what occurred at meetings inside EGA offices" and was conveying "inadmissible hearsay" information obtained by "debriefing the cooperators." (Government brief on appeal at 41.)

The government also offered GX 59-65 as "summaries regarding the EGA interactions with the undercover operation" (Tr. 195) on various dates, and six of those seven charts indicated that the cash derived from the fictitious invoices and EGA checks went to Groysman and Branfenbrener or to Groysman alone. These charts were prepared at the direction of Ginzburg, and his testimony provided the only foundation for their admission, despite the fact that "he had no personal knowledge of many of the matters conveyed on those exhibits" (Government brief on appeal at 42)--which suffered the additional "fundamental[]" flaws that they "contained inaccurate and misleading information" and were, in any event, not the sort of "'summary charts'" whose admission is authorized by the rules of evidence (id.).

Although the government argues that its introduction of the inadmissible evidence did not affect Groysman's substantial rights because it was corroborated by other evidence, we do not see in the record any corroboration (a) for the representations in five of those charts--GX 59, 60, 63, 64, 65--that Groysman received cash, or (b) for Ginzburg's testimony endorsing those exhibits for the proposition that Groysman received cash. Each of those five charts showed Yuzovitskiy as giving cash either to both Groysman and Branfenbrener or to Groysman alone. But Ginzburg never attended one of their meetings and could not see inside those offices. And Yuzovitskiy testified that he did not remember ever giving cash to Groysman. (See Tr. 958.)

Moreover, Ginzburg--though lacking first-hand knowledge--was adamant in testifying that cash was received by Groysman in several instances in which other evidence suggested to the

contrary. For example, according to GX 60, Yuzovitskiy on March 2, 2010, gave cash to both Groysman and Branfenbrener. Ginzburg admitted that there were "no video" and "no recordings discussing" the handing of an envelope to Groysman on that day (Tr. 207); and we have seen no indication in the record that a March 2 videotape was played for the jury. Nonetheless, Ginzburg testified that cash was given to Groysman "based on the video and [his] monitoring." (Id. at 208.) Further, he acknowledged that on that date "[a]n envelope was placed in the desk"; he testified that both Groysman and Branfenbrener were "present, hence the description" of the cash as going to "both of them." (Id.) Yuzovitskiy testified that he frequently put the cash in Branfenbrener's desk drawer. Despite the fact that the envelope on March 2 was placed in a desk drawer, Ginzburg testified "I don't believe it's misleading" to "suggest that it's actually going to the [sic] Lyubov Groysman." (Id.)

Similarly, GX 63 indicated that on April 29, 2010, cash went to both Branfenbrener and Groysman. The video of that meeting, however, showed that Groysman was in the front room of the EGA offices when the cash was being handed to Branfenbrener in a different room. (See Tr. 250-53.) Ginzburg testified that he "[a]bsolutely" was "aware that Lyubov Groysman was not in the back room where this transaction occurred." (Id. at 252.) But he testified that because the cash was derived from an April 21 EGA check that had been given to Yuzovitskiy by Groysman, that "context" meant that the cash, though handed to Branfenbrener, went to both Branfenbrener and Groysman. (Id.)

So far as we have been able to determine from the record, only one of the charts in the improperly admitted GX 59-65 group had any corroboration for its representation that Groysman was given cash: GX 61 indicated that Grigory G. gave cash to Groysman on March 18, and indeed, Grigory G. so testified, stating that when he said to Groysman "Take it. . . . It has this and that," his

phrase "this and that" referred to "[i]nvoice and cash" (Tr. 664). However, this testimony itself lacked corroboration. To begin with, there was no substantiating video because, as Ginzburg conceded, "the video on that date [wa]s pointed at the ceiling" (id. at 234). Thus, although Ginzburg testified that he watched the video of what occurred at EGA that day, he conceded that he did not see "any transaction where Lyubov Groysman receive[d] cash." (Id. at 233-34.) In addition, although Ginzburg claimed to have had "personal knowledge" that cash was given to Groysman at that meeting because he "heard it happen" (id. at 234 (emphasis added)), the audio transcript of the meeting does not mention money or cash or the equivalent (see GX 2-10). Instead, the transcript reveals a discussion of invoice errors and the prices of various items. Finally, although Ginzburg admitted at trial that he knew who Groysman was on March 18--and plainly Groysman was known to Grigory G. who called her his "partner[]" in crime--Ginzburg did not deny that some of his notes on the meeting indicated that an envelope containing money had been handed to an "unidentified female." (Tr. 234 (emphasis added).)

The government argues that there was other evidence that Groysman at least had knowledge of the DME scheme. Most of it was circumstantial. Yuzovitskiy testified that he and Grigory G. began working with Groysman, Branfenbrener, and Leica in the DME scheme on the recommendation of another coconspirator (see, e.g., id. at 790-93); Yuzovitskiy described a meeting at EGA on February 5, 2010, in which he told Branfenbrener and Groysman what the real prices were for whirlpools (see id. at 821-23); both Grigory G. and Yuzovitskiy testified that, in the scheme, they received the go-bys and/or checks from Groysman (see id. at 659, 744-45); and Yuzovitskiy testified that Groysman, though saying that she was not an owner or a boss and worked at EGA only part time, said "'I am managing here. . . . I am managing for [Branfenbrener]'" (id. at 835 (quoting GX 2-11,

at 9); see also GX 2-11, at 1, 9 (indicating that "managing" in both instances was spoken in English)). In addition to this circumstantial evidence as to Groysman's knowledge of the DME scheme, the government points to direct evidence, consisting of Yuzovitskiy's testimony that he "ha[d] discussions" with Groysman in which she asked him when he would deliver cash to EGA or Leica (see Tr. 958-59). But the corroboration for that testimony too was sparse. For example, although Ginzburg testified that all of the telephone conversations of the cooperators were recorded (see id. at 49), the government has not cited to us to any telephone conversation in which Groysman asked about cash, and points only to the transcript of the February 5, 2010 meeting. At the beginning of that transcript, Yuzovitskiy is recorded as stating, in English, "Today is February fifth. Time--1:23. I am going to EGA to bring it, uh, cash." (GX 2-4, at 2.) The transcript, using "LG" for Groysman, "VY" for Yuzovitskiy, and "GB" for Branfenbrener, included the following, translated from Russian:

> VY: Will you give me the money or not?... I am leaving.
>
> LG: I am giving it. And when will you bring..?
>
> VY: I gave it already.
>
> LG: Yes?
>
> GB: He gave it already.

(Id. at 4 (all ellipses in the transcript).) At trial, Yuzovitskiy testified that he "gave a yellow envelope with the money to Branfenbrener" (Tr. 819), and his testimony about the above interchange was as follows:

> Q. Then the defendant states, "I am giving it. And when will you bring-- And then you state, "I gave it already." On line 44 the defendant states, "Yes." Branfenbrener states on line 45, "He gave it already."
>
> What were the three of you speaking about in the last lines that I just read?

- 24 -

. . . .

A. Before Lyubov Groysman was going to give me check, she asked me when I will bring the money which was owed previously.

Q. When you say "the money," what are you referring to?

A. We were talking about the cash and check.

Q. Is that the cash that we saw you handing in an envelope to Branfenbrener before this portion of the conversation?

A. Yes, sir.

(Id. at 822-23.) Thus, Yuzovitskiy testified that Groysman's words "When will you bring"--a question that ended without a spoken object--meant when will you bring "cash" or "money which was owed previously."

In sum, the government's evidence that Groysman's words and conduct showed that she knowingly participated in the DME scheme consisted principally of testimony by one cooperator that when Groysman asked "When will you bring" and did not specify any object to be brought, she meant cash, and testimony by the other cooperator that when he handed her something described as "ha[ving] this and that," she knowingly received cash. In light of the central role played by the evidentiary errors described above in the government's strategy, this evidence does not come close to defeating Groysman's claim of plain error.

Although the government argues that it did not emphasize the inadmissible evidence in its summation, in that it did not mention GX 59-65 and that it mentioned Ginzburg only once, we are unpersuaded in light of the record as a whole that the impact of Ginzburg's testimony, or of his misleading charts, was minimal. While GX 59-65 were not mentioned by name, the government told the jury that although Yuzovitskiy and Grigory G. were longtime "criminals" (Tr. 1306), their

testimony was corroborated by, inter alia, "documents" (id. at 1307). Those charts--pictorial and easy to follow, generally showing only four or five boxes, connected by arrows indicating who gave fraudulent documents, checks, and cash to whom--were likely to be more memorable to jurors than the other documents, which consisted principally of lists of medical equipment on the go-bys and fictitious invoices or the transcripts of the translated conversations.

And although the government mentioned Ginzburg in its summation only once, it did so by telling the jury, "You can trust the testimony that came from Vadim Yuzovitskiy and Grigory [G.]" in part because "every time they went into a meeting with one of the defendants, they met with an agent before they went in, they met with an agent when they came out and you heard from that agent. So you can trust that testimony." (Id. (emphases added).) While that was the only mention of Ginzburg in the government's summation, we cannot ignore the fact that his testimony constituted about 40 percent of the live evidence at trial. Testimony was presented on nine days; Ginzburg testified on four of those days, and on the first three days of the trial, he was the only witness.

We also note that because the conversations among the cooperators and the targets of the investigation were conducted almost entirely in Russian, the jury was likely to accord special deference to Ginzburg's interpretations of those conversations, given the government's elicitation at the start of trial that Ginzburg's native language--and the language he still spoke at home and in social situations--was Russian and that he had passed several governmental tests for translation between Russian and English. When "a case agent also functions as an expert for the government, the government confers upon him" an "aura of special reliability and trustworthiness," creating a "risk of prejudice . . . that increases when the witness has supervised the case." United States v. Dukagjini,

326 F.3d at 53. Our unease in this regard is heightened in the present case by the facts that Ginzburg "personally transcribed at least the final transcriptions" of these meetings (Tr. 60) and was allowed at trial, over objection, to give interpretations as to what Yuzovitskiy and Groysman were discussing in Russian, for example interpretations that went beyond what was in the English-translation transcripts to which the parties had stipulated (see id. at 285-86). And some of Ginzburg's opinions interpreted conversations and events as incriminating to Groysman even though those conversations and events, as discussed above, were not recorded or were recorded but did not appear to inculpate her.

In sum, the government has conceded that at Groysman's trial there were a large number of erroneously admitted pieces of evidence inculpating Groysman, including the many hearsay assertions by the government's main witness; the simple and easy-to-remember charts that were prepared on the basis of hearsay, whose admission in evidence was not authorized by the rules of evidence, and whose contents were inaccurate and misleading; and the impermissible opinion evidence from the government's main witness whose views were likely to be given substantial credence by reason of both his status as a law enforcement agent and his expertise in the language spoken by Groysman and the cooperators. The sole witness who could testify from first-hand knowledge in support of the government's contention that Groysman received cash from the present fraudulent scheme was Grigory G., a longtime criminal who had continued his fraudulent activities after escaping punishment in the past by assisting law enforcement authorities to convict others. Grigory G.'s testimony that he gave cash to Groysman was not corroborated by the electronic surveillance and was contrary to Ginzburg's debriefing notes; and Grigory G.'s uncorroborated testimony was the sole admissible basis for Ginzburg's repeated hearsay testimony that Groysman

received cash at least once and for the government's reiteration of that assertion in summation. We conclude that the evidentiary errors now conceded by the government were serious and central to the prosecution's strategy; as such, they deeply undermine our confidence in the fairness and outcome of Groysman's trial. The paucity of the government's other evidence, although not as central to our decision, bolsters our conclusion that there was plain error.

Finally, at trial, the government told the jury that it could trust the testimony of the longtime criminal cooperators because, inter alia, their testimony was corroborated by Ginzburg. (See Tr. 1307.) On appeal, while confessing numerous errors in the admission of the testimony by Ginzburg and the exhibits he had prepared, the government urges this Court to disregard those errors because, inter alia, "Ginzburg's testimony about Groysman's role in the fraud was . . . corroborated by . . . the cooperators" (Government brief on appeal at 48 (emphases added)). We can only conclude that an affirmance of a conviction on the basis of such arguments, in the face of so many conceded errors, would seriously affect the fairness, integrity, and public reputation of these judicial proceedings.

CONCLUSION

We appreciate the government's candor in acknowledging the errors at trial. We have considered all of the government's arguments in support of affirmance and have found them to be unpersuasive. The judgment convicting Groysman is vacated, and the matter is remanded for a new trial.