

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00883-CR

Gabrielle de **ARROYO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2018CR5788
Honorable Ron Rangel, Judge Presiding

Opinion by:　Beth Watkins, Justice

Sitting:　　　Patricia O. Alvarez, Justice
　　　　　　　Irene Rios, Justice
　　　　　　　Beth Watkins, Justice

Delivered and Filed: July 28, 2021

AFFIRMED

After hearing evidence that sounded like the plot of a summer blockbuster movie, the jury convicted Gabrielle de Arroyo of felony hindering apprehension or prosecution for her part in helping her son and two other inmates—all charged with capital murder—escape from the Bexar County jail. On appeal, de Arroyo claims the evidence is legally insufficient to support the verdict, the trial was riddled by plain error that affected her substantial rights, and her lawyer provided ineffective assistance of counsel. We affirm.

BACKGROUND

On March 2, 2018, and in broad daylight, inmates Luis Arroyo, Eric Trevino, and Jacob Brownson, wearing only their jail-issued white boxers and t-shirts, escaped from a high-ceilinged, partially open-air recreation yard at the Bexar County jail. The bottom part of the enclosure of the yard is cinderblock, but the top part consists of solid metal bars spaced tightly together and surrounded by metal mesh fencing. The men climbed up to the top part of the wall, where both the fencing and one of the bars had been cut clean through. They pushed the bar apart, squeezed through the opening, and made their way to a nearby roof. The rest of the escape was captured on a surveillance video: they dropped a rope made of sheets down the front side of the jail and the three inmates scaled down the sheets to the ground, hustled to a waiting white Volkswagen Jetta, and jumped in. The Jetta peeled out before the passenger doors even closed.

Additional surveillance video showed the Jetta arrive at Gabrielle de Arroyo's apartment building where only Luis got out of the car. He entered the building, still in boxers and a t-shirt, and minutes later came out in street clothes, carrying a bag. The getaway driver then dropped off the men at a Sonic restaurant and, having had a change of heart, called 9-1-1 to report what she had done and where the men were. By then, an all-hands-on-deck manhunt had started. All three inmates were apprehended near the Sonic. Police found a pair of the jail-issued boxers in the Sonic trash can and an abandoned bag, like the one Luis had carried out of de Arroyo's apartment building, containing a felt fedora, hair clippers, and mail.

After interviewing the getaway driver, Trevino's girlfriend Michelle Ramirez, authorities turned their attention to Marcos Maldonado. Maldonado, like Ramirez, admitted his involvement in the escape and named Gabrielle de Arroyo as an accomplice. De Arroyo denied involvement. But physical evidence, like recorded jail calls between de Arroyo and her son, mobile phone data showing communications between de Arroyo, Maldonado, and Ramirez, and video surveillance

corroborated Ramirez and Maldonado's accounts: de Arroyo purchased the saw blade that was used to cut the escape hole; Maldonado, at de Arroyo's direction, tied the saw blade to the fishing line that had been cast out of the recreation yard; and Ramirez drove, both on the day the saw blade was smuggled in and on the day of the escape. The jury convicted de Arroyo, and the trial court imposed the maximum sentence—ten years' imprisonment.

## ANALYSIS

In three arguments on appeal, de Arroyo complains about the State's reliance on the testimony of its lead investigator, through whom out-of-court statements were admitted into evidence not for the truth of the matter asserted, but to explain the course of the investigation.

### *Sufficiency of the Evidence*

De Arroyo first argues that the evidence is legally insufficient[1] to support her conviction because the State did not present fact witnesses with personal knowledge and relied instead on the lead investigator's testimony about what he learned during the investigation.

### *Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Under that standard, we examine all the evidence in the light most favorable to the verdict and resolve all reasonable inferences from the evidence in the verdict's favor to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). In a legal-sufficiency analysis, no evidence is ignored because the standard requires a reviewing court to

---

[1] De Arroyo also argues that the evidence is factually insufficient. The *Jackson v. Virginia* standard "essentially incorporates a factual-sufficiency review." *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010) (plurality opinion).

view all the evidence in the light most favorable to the verdict. *Cary v. State*, 507 S.W.3d 750, 759 n.8 (Tex. Crim. App. 2016). An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). Rather, a court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally. *Id*. This rationality requirement is a key and explicit component of the *Jackson* sufficiency standard. *See Jackson*, 443 U.S. at 319.

We consider all the admitted evidence, even if it was not properly admitted. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014). Inadmissible hearsay, for instance, admitted without objection may not be denied probative value merely because it is hearsay. TEX. R. EVID. 802; *Colone v. State*, 573 S.W.3d 249, 265 (Tex. Crim. App. 2019). Additionally, direct and circumstantial evidence are equally probative, and circumstantial evidence alone can be sufficient to establish guilt. *Nowlin*, 473 S.W.3d at 317.

"The trier of fact is the exclusive judge of the credibility and weight of the evidence and is permitted to draw any reasonable inference from the evidence so long as it is supported by the record." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). Since the trier of fact is the exclusive judge of the credibility and weight of the evidence determinations, we must defer to its determinations. *Nowlin*, 473 S.W.3d at 317. However, inferences based on mere speculation are not sufficient to support a criminal conviction. *Ramsey*, 473 S.W.3d at 809.

*Applicable Law*

A person commits the offense of hindering apprehension or prosecution if, "with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense" she "(1) harbors or conceals the other; (2) provides or aids in providing the other with any means of avoiding arrest or effecting escape; or (3) warns the other of impending discovery or apprehension." TEX. PENAL CODE ANN. § 38.05(a). The offense "is a felony of the third degree if

the person who is harbored, concealed, provided with a means of avoiding arrest or effecting escape, or warned of discovery or apprehension is under arrest for, charged with, or convicted of a felony," and "the person charged under this section knew" of that status. *Id.* § 38.05(d).

"A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id*. § 7.02(a)(2). Evidence is sufficient to sustain a conviction under the law of parties if it shows that the defendant was physically present at the offense and encouraged the commission of the offense either by words or other agreement. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). An agreement among parties to act together in common design is seldom proven by words. *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977). Often, the State must rely on the actions of the parties, shown through direct or circumstantial evidence, to establish the understanding or common design to commit the criminal offense. *Pesina v. State*, 949 S.W.2d 374, 383 (Tex. App.—San Antonio 1997, no pet.). In reviewing the sufficiency of the evidence to support a defendant's participation as a party, we may consider "events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000) (internal quotation marks omitted).

*Application*

The question here is whether the State presented sufficient evidence that de Arroyo, either acting alone or together as a party with Ramirez and/or Maldonado and acting with the intent to hinder the apprehension of Luis Arroyo for a felony offense, provided or aided in providing Luis with means of escaping Bexar County Jail by providing a saw blade, transportation, and/or clothing, and that she did so knowing Luis was charged with a felony.

Though both Ramirez and Maldonado were on the State's witness list, neither testified. Instead, Bexar County Investigator David Garcia testified for two days about the course of the investigation—about the interviews with Ramirez and Maldonado and the actions he and other investigators took based on those interviews. Garcia and a few other witnesses also testified about the evidence collected, which included surveillance video from multiple locations, recordings of jail calls, cell phone data, photographs, and physical items used or discarded during the escape. Garcia testified that conversations with the two accomplices led investigators to view jail surveillance video from February 23, the day Ramirez said she drove de Arroyo and Maldonado to the jail so they could deliver the saw blade.

That video showed Maldonado, in a white t-shirt, standing near the entrance to the jail. De Arroyo, wearing a fedora type hat, walked past Maldonado and into the lobby of the jail. Inside surveillance showed de Arroyo in the lobby; outside surveillance showed Maldonado pacing and looking towards the area below the recreation yard. De Arroyo walked outside, approached Maldonado and after a short exchange, went back inside the jail. But she lingered in the vestibule between the two sets of doors. Maldonado followed her into the vestibule, where they appeared to talk. Then they both went back outside. They headed in opposite directions: Maldonado walked with purpose down the entry steps and to his right, to the bushes underneath the recreation yard, while de Arroyo walked to her left and out of the surveillance area. Maldonado moved his hands in the area of the bushes then followed de Arroyo. All the while, the outside surveillance showed Ramirez's white Jetta passing back and forth in front of the jail.

Over a hearsay objection from defense counsel and an instruction from the trial court that the testimony was not offered for its truth, Garcia testified that when interviewed, Maldonado narrated what was happening in the February 23 video. Maldonado told Garcia that he was having misgivings about his role, so he "kind of backed off a little bit," and told de Arroyo that he did not

see the fishing line. But when they went outside, she told him, "'Hey, you know, you need to do this.'" And "according to [Maldonado], the way they did it, is they tied a string onto—or he tied a string onto the—with the contraband onto the bottle, and they were able to fish it back up into the recreation yard." While the trial court did not admit that narrative for its truth, it did admit considerable circumstantial evidence without objection which connected de Arroyo to the saw blade that investigators who examined the cuts in the fencing discovered approximately a foot from "where the hole was."

In a recorded jail call early on February 5, Luis told de Arroyo, "The packages, those packages are, they come in three-packs, alright?"; "They have like three in each one." A couple hours later, de Arroyo informed Luis she had made her way to "Builders Square" and talked to the "master over here, the expertise in this department." Surveillance video from that same evening captured de Arroyo taking a cab away from her apartment building. A receipt from the cab company confirmed the ride was to a Home Depot. Surveillance video showed de Arroyo inside the Home Depot, talking to an associate. In unobjected-to testimony, Garcia testified that the associate "remembered Ms. Gabriella going in there to buy a saw blade. And they were able to provide us with a receipt" for "the exact saw blade that was bought from that Home Depot and purchased by Ms. Gabriella." The receipt showed she purchased a six-inch Diablo brand Steel Demon saw blade, the same make and model blade as that found near the escape hole.

De Arroyo, in a call with Luis on February 16, clarified that she bought a "6-inch" rather than a 6-pack. In a call on February 23 that took place while de Arroyo was at the jail, de Arroyo told Luis that Maldonado is "going to be right there in a minute" and Luis responded, "he's going to throw [the water bottle] down" but first "wanted to stick out" his "arm so you could see where it is coming from." Other recorded jail calls between Luis and de Arroyo—ranging in date from February 5 to March 1—have the two using code (e.g., "church" for "jail"; "Panamanian flags"

for the "American and Texas" flags in front of the jail; "little boy" for "Maldonado"; "lights" for "fishing line"; "blue one" for "escape") to allude to the plans for escape.[2]

As discussed above, surveillance video from March 2 showed Luis enter de Arroyo's apartment building shortly after the escape wearing jail clothes and soon exit wearing street clothes. In two interviews, de Arroyo repeatedly denied any involvement in the escape, but she eventually acknowledged she knew that Luis was in jail on a murder charge. Confronted with the surveillance videos, she admitted going to Home Depot, but said that it was to buy scissors to fix her shower, and she admitted she had been at the jail on February 23, but she said it was to put money on Luis's books. She denied knowing either Ramirez or Maldonado, even when confronted with phone records showing she had communicated with Ramirez the day the saw blade was smuggled into the jail and the day of the escape, and Maldonado in the month leading up to the escape.[3] And she said that when Luis came to her apartment on March 2 and changed clothes, he told her he had to leave quickly because he had to go talk to his parole officer.

Recorded phone calls, surveillance video, receipts and unobjected-to hearsay together revealed that: 1) Luis encouraged de Arroyo to buy a saw blade before the escape; 2) de Arroyo went to Home Depot and bought a saw blade; 3) de Arroyo talked to Luis about that purchase; and 4) de Arroyo was present at the jail and talked to Luis about Maldonado's efforts to pass the saw

---

[2] In these calls, Luis: told de Arroyo "I think that I can do it with one [small hand saw]"; instructed her that "before you throw it, you all put, you all put the magnet inside and I grab it with mine"; told her she doesn't have to enter the "church," she just is going to sit there on the bench in front of it; told her that they will pick up a friend, "a Panamanian," because he is the one who is going to "scrub with the thing"; stated that, "The thing comes out, you go, and" then "it gets tied up and that's it"; said the package will look like trash on the ground, full of water, "For the weight"; asked her "So you all are going to pick up the little boy . . . right?"; told her the "little kid is going" and "you're like a consultant"; said to tell the boy that if he didn't see the "lights" he ought to just throw "it to the other side over there so it will stay on the ceiling"; discussed the "Panama" flags and the bushes; gave her the time he would be in the recreation yard on February 22; told her not to worry about the failed attempt of February 22 and that they will try again; told her, on March 1, not to come put money on his books, that the "blue one" lifts tomorrow.

[3] Data extractions from their cell phones showed de Arroyo communicated with Ramirez on February 23 (five times) and March 1, and with Maldonado on February 17, 22 (sixteen times), and 23. On February 22 and 23, de Arroyo and Maldonado texted about timing and de Arroyo provided Maldonado her address.

blade along to the inmates. *See Zill v. State*, 355 S.W.3d 778, 788 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (jury could draw its own conclusions based on video of relevant incident). The evidence was sufficient to prove beyond a reasonable doubt that de Arroyo committed the acts alleged in the indictment. Accordingly, we overrule her first issue.

### Fundamental Error

Although separately briefed, de Arroyo's argument that she had a fundamentally unfair trial is closely aligned with her sufficiency argument "that nearly all of the evidence was inadmissible hearsay" and "no witnesses were presented that had personal knowledge." She again takes issue with the scope of evidence that was either offered not for the truth of the matter asserted, but to explain the course of the investigation, or was hearsay, bolstering, or inadmissible opinion testimony admitted without objection or a limiting instruction. She argues the jury was "poisoned [] from the very beginning on a fundamental level." We disagree.

### Applicable Law

The system of adjudication at work in Texas "is chiefly characterized by an array of rules which are optional with the litigants." *Marin v. State*, 851 S.W.2d 275, 278 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997), *and abrogated on other grounds by Matchett v. State*, 941 S.W.2d 922 (Tex. Crim. App. 1996). "This is consistent with an adversarial process in which the trial judge, as institutional referee, enforces rules of contention only when asked to do so by a litigant for whose benefit the rule exists." *Id*. "A cursory examination of the myriad evidentiary and procedural rules comprising our system reveals that most of them are of this type." *Id*. Hearsay "might be excluded upon the request of a party to the lawsuit[,]" but a "trial judge has no duty to exclude it on his own, and would probably fall into error if he did." *Id*. And, "[o]nce admitted without objection, such evidence enjoys a status equal to that of all other admissible evidence"; "it has probative value and will support a

judgment in favor of the party offering it." *Id*. When a defendant claims on appeal that the trial court erred in admitting evidence, he must have made a proper and specific objection at the time the evidence was offered to preserve his right of review of that evidentiary claim. *Moff v. State*, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004).

*Application*

As de Arroyo acknowledges, the lion's share of the evidence she targets as inadmissible "hearsay, bolstering, and inadmissible opinion testimony," was not objected to at trial. She relies on the federal doctrine of plain error in urging this point of error. FED. R. CRIM. P. 52. Under Rule 52(b), "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." *Id*. So, federal courts may reverse a conviction based on unobjected-to hearsay evidence if there has been a plain error affecting substantial rights of the accused. *Smith v. United States*, 343 F.2d 539, 542 (5th Cir. 1965). De Arroyo likens this case to *United States v. Groysman*, 766 F.3d 147 (2d Cir. 2014), in which "the prosecution chose to lead with [Investigator] Ginzburg's testimony, which gave a coherent, and superficially reliable, narrative of the government's version of Groysman's participation in the fraudulent scheme." *Id*. at 157. As Groysman put it, Ginzburg: had "recounted factual matter as to conduct by Groysman that he could not have learned except from statements by the cooperators"; "was improperly allowed to give his opinion as to Groysman's culpability"; and "was allowed to give foundation testimony for the admission of documents as to whose accuracy he had no personal knowledge." *Id*. at 154. The Second Circuit concluded "that given the serious impropriety of the prosecution's use of this witness in light of the record as a whole, the evidentiary errors" met the standard for plain error review and required a new trial. *Id*. at 154–55.

De Arroyo argues her trial was even worse than Groysman's, in that "none of the witnesses who made statements that were presented to the jury through Investigator Garcia were brought in to testify," resulting in Confrontation Clause violations. But there is no analog to Rule 52 in Texas.

Rule 52 is basically "a harm-based doctrine of error-preservation" that involves "peering behind the procedural-default curtain to look at the particular 'circumstances' of the claim within the case at hand." *See Proenza v. State*, 541 S.W.3d 786, 795–96 (Tex. Crim. App. 2017). No such doctrine exists in Texas. *See id.* Under *Marin*, our system contains three types of rules: (1) absolute or systemic requirements or prohibitions, (2) rights that must be implemented unless expressly waived, and (3) rights that are implemented upon request. *Marin*, 851 S.W.2d at 279. There "is no common-law 'fundamental error' exception to the rules of error preservation established by *Marin*." *Proenza*, 541 S.W.3d at 793. Nor does Texas Rule of Evidence 103(e), providing that, in criminal cases "a court may take notice of a fundamental error affecting a substantial right, even if the claim of error was not properly preserved," divine "a freestanding, harm-based doctrine of error preservation." *Id*. at 795; TEX. R. EVID. 103(e). Rather, the fundamental errors described in Rule 103(e) are simply category-one and -two *Marin* errors. *Proenza*, 541 S.W.3d at 795. All of de Arroyo's complaints here are of category-three *Marin* errors. As a result, because she did not timely complain about the errors she now identifies as "fundamental," she forfeited them. *Burg v. State*, 592 S.W.3d 444, 448–49 (Tex. Crim. App. 2020) (rights and requirements that can be affirmatively insisted upon by a party and acted on by a trial court are subject to the general preservation rule). We therefore overrule her second issue.

### Ineffective Assistance of Counsel

In her last issue, de Arroyo contends her trial counsel "failed repeatedly to make timely and effective objections, allowing the state to admit a plethora of inadmissible evidence without objection and thus without preserving valuable claims for purposes of appeal." She argues counsel

failed to object to evidence that violated her confrontation rights, was inadmissible hearsay or "inadmissible opinion testimony by non-expert witnesses, including characterizations of the Appellant that were extremely damaging to her image before the jury." The record does not establish deficient performance or prejudice, so we will overrule this point of error.

*Standard of Review*

To prevail on a claim of ineffective assistance of counsel, an appellant must prove that counsel's performance was deficient, and that deficiency prejudiced the defense. *Prine v. State*, 537 S.W.3d 113, 116 (Tex. Crim. App. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish deficient performance, an appellant must prove by a preponderance of the evidence that counsel's representation fell below an objective standard of reasonableness. *Id*. We apply a highly deferential scrutiny to trial counsel's performance. *Mata v. State*, 226 S.W.3d 425, 428 (Tex. Crim. App. 2007). An appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that the conduct constituted sound trial strategy. *Prine*, 537 S.W.3d at 117.

To overcome this presumption, an appellant must establish that counsel's ineffectiveness is "firmly founded in the record." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (internal quotation marks omitted). The record in a direct appeal is often insufficient to present an ineffective assistance claim because it is usually undeveloped and does not provide counsel's reasons for her actions. *Id.* Trial counsel should ordinarily be afforded an opportunity to explain her actions before they are denounced as ineffective. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012). A reviewing court should not find deficient performance unless trial counsel has had an opportunity to explain her actions or counsel's challenged conduct was so outrageous that no competent attorney would have engaged in it. *Goodspeed*, 187 S.W.3d at 392. We may not find trial counsel's performance deficient "if any reasonably sound strategic

motivation can be imagined." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). "[A] silent record on the reasoning behind counsel's actions is sufficient to deny relief." *Badillo v. State*, 255 S.W.3d 125, 129 (Tex. App—San Antonio 2008, no pet.).

*Application*

De Arroyo did not file a motion for new trial or otherwise attempt to develop a record to support her claim of ineffective assistance. *See Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003). As a result, the record is silent as to counsel's reasons for failing to take the actions she argues were required here. *See Lopez*, 343 S.W.3d at 143–44. To prevail on her claim of ineffective assistance, she must therefore show the challenged conduct was so outrageous that no competent attorney would have engaged in it. *See Menefield*, 363 S.W.3d at 593.

De Arroyo's complaint here—as above—relates to the State's presentation of the bulk of its case through Garcia's "course of investigation" testimony. De Arroyo argues that defense counsel ought to have repeatedly objected. Counsel made some successful hearsay objections during Garcia's testimony and requested and received a limiting instruction in the court's charge. When the record is silent as to why counsel failed to persevere in his objections, it must be presumed that this was a reasonable decision. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *see also Delgado v. State*, 235 S.W.3d 244, 250, 254 (Tex. Crim. App. 2007) (noting counsel may have decided, as a matter of trial strategy, not to repeatedly object to admission of evidence and request a limiting instruction); *Infante v. State*, 397 S.W.3d 731, 739 (Tex. App.—San Antonio 2013, no pet.) (failure to object to hearsay testimony of police officers not deficient performance when record was silent as to trial counsel's reasoning or strategy).

The record also reflects that counsel was very familiar with the State's evidence and that he tapped into the investigation stream, over the State's objection, to de Arroyo's benefit. On cross-examination of Garcia, the jury heard information that was in Garcia's "prosecution report"

but that Garcia was unaware of: an internal affairs report documenting that jail authorities had been warned by an inmate that Trevino was going to escape with the assistance of an inmate named Vollmer, that the escape would involve the use of a fishing line, and that the pair were receiving contraband, six saw blades, cell phones and drugs—all being brought in by Vollmer's girlfriend. The inmate also said the contraband included rope that was supposed to be used to escape out of the very unit Luis, Trevino, and Brownson escaped from.

Counsel also presented to the jury other evidence that was unflattering to the State's case, including, among other things: that numerous interior surveillance cameras "didn't capture the incident that happened" even though the jail was aware of the possible escape; that phone records reflect that Trevino's mother, Mary, was the point person who connected Ramirez and Maldonado with de Arroyo; that messages between Mary and Maldonado appear to allude to escape plans; that investigators failed to investigate Mary; that the jail videos equally reflect de Arroyo's version of what happened—she was going to put money on her son's books; that Maldonado said he tied up a bottle opener, rather than a saw blade; that it is not uncommon that saw blades, knives, or contraband are brought into the jail; and, that it is possible that the bar was cut prior to when de Arroyo purchased the blade on February 5, because the bar appeared intact and it was only when investigators "pulled on it" that they recognized that it had been cut through. Counsel painted a picture of a client who had been manipulated and was made to take the fall for the failure of Bexar County to secure the men. Though the State started the case by portraying de Arroyo as the architect of the escape, it ended its case saying, "All it takes is to aid, and all it takes is to help. That's what this case boils down to." On this record, counsel proved himself familiar with the facts and the law. He also successfully lodged objections to the State's evidence. We cannot conclude counsel's conduct fell outside the range of reasonable assistance. We therefore overrule de Arroyo's last issue.

## CONCLUSION

Based on the foregoing, we overrule de Arroyo's issues on appeal and affirm the trial court's judgment.

Beth Watkins, Justice

DO NOT PUBLISH