[Cite as *State v. J.E.*, 2024-Ohio-4461.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                              :

      Plaintiff-Appellee,                           :              No. 22AP-623
                                         (C.P.C. No. 20CR-5271)

v.                                                              :

[J.E.],                                                        :              (REGULAR CALENDAR)

      Defendant-Appellant.                        :


D E C I S I O N

Rendered on September 10, 2024


**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Wilson*, for appellee.

**On brief:** *Law Offices of Thomas F. Hayes LLC, Thomas F. Hayes*, and *Amir Elkhabiry*, for appellant.


APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} Defendant-appellant, J.E., appeals from the judgment of the Franklin County Court of Common Pleas, which convicted him of three counts of rape and three counts of gross sexual imposition. For the following reasons, we affirm.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2} On November 6, 2020, a Franklin County Grand Jury returned a six-count indictment charging appellant with three counts of rape pursuant to R.C. 2907.02 and three counts of gross sexual imposition pursuant to R.C. 2907.05. All charges involved appellant's daughter, T.E., alleged to be nine or ten years old when the charged conduct

occurred.  Following amendments requested by the prosecution prior to trial, which were approved by the trial court, the six counts consisted of:

- Count 1 – Rape pursuant to R.C. 2907.02, committed on or about March 9 through 11, 2019, by way of fellatio with T.E., who was less than thirteen years of age, to wit: nine years old.

- Count 2 – Gross Sexual Imposition pursuant to R.C. 2907.05, committed on or about March 9 through 11, 2019, by way of sexual contact with T.E., who was less than thirteen years old at the time.

- Count 3 – Gross Sexual Imposition pursuant to R.C. 2907.05, committed on or about March 12, 2019, by way of sexual contact with T.E., who was less than thirteen years old at the time.

- Count 4 – Rape pursuant to R.C. 2907.02, committed on or about March 12, 2019, by way of fellatio with T.E., who was less than thirteen years of age, to wit: nine years old.

- Count 5 – Gross Sexual Imposition pursuant to R.C. 2907.05, committed on or about July 8 through 10, 2019, by way of sexual contact with T.E., who was less than thirteen years old at the time.

- Count 6 – Rape pursuant to R.C. 2907.02, committed on or about March 7 through 9, 2020, by way of fellatio with T.E., who was less than thirteen years of age, to wit: ten years old.

(Nov. 6, 2020 Indictment at 1-2; May 31 to June 1, 2022 Tr. at 6-9.)

{¶ 3}   Appellant entered a plea of not guilty, and the matter proceeded to a jury trial held May 31 to June 3, 2022.  The prosecution called T.E., her mother, forensic interviewer Heather Cassill, Sexual Assault Nurse Examiner nurse Logan Stover, and Columbus Police Crime Laboratory DNA forensic scientist Lynndsay Simon to testify.

{¶ 4}   T.E. testified she was born in mid-March 2009 and was 13 years old at the time of trial.  She lives with her mother and 3 brothers who, at the time of trial, were 17, 12, and almost 4 years old.  She also has an older brother and sister who live out of the home. T.E. testified that her relationship with her mother is "very close" and said she "like[d] to hang out with [her] brothers," playing board games, games on their phone, hula hoop and football outside, and going to the pool.  (Tr. at 37-41.)  T.E. identified appellant in the courtroom as her father, and said he now lived separately from her family.

{¶ 5}   T.E. testified to the layout of the home depicted in photographs introduced as State's Exhibit A.  She described her home as a one-story, four-bedroom house with a basement.  She has her own bedroom on the first floor, her brothers share the other two first floor bedrooms, and her mother's bedroom, which appellant used to share, is in the basement.

{¶ 6}   T.E. testified that she was in court because "[m]y dad was doing something inappropriate to [her]."  (Tr. at 53.)   According to T.E., the first time something inappropriate occurred was in 2019 "around [appellant's] birthday," which is March 11, and clarified she did not think it was March yet but rather the end of February.  (Tr. at 53.) During this incident, while everyone was sleeping at night, appellant came into her bedroom, sat on her legs so she could not move, kissed her on her lips and neck, then told her not to tell anybody what happened. (Tr. at 54.)  During cross-examination, T.E. stated she was "not sure" about the exact date of the first time appellant was inappropriate but agreed with defense counsel that this event occurred around appellant's birthday on March 11, 2019. (Tr. at 121.)  T.E. testified she believed a similar incident—where appellant kissed her on the mouth—took place the following evening while she was alone in the kitchen by the sink.

{¶ 7}   T.E. recalled a third incident occurring in 2019 around one of her brother's birthdays, which is March 5th.  (Tr. at 61.)  T.E. testified that appellant asked T.E. to come down to the basement "sitting room," told her to get on her knees and to open her mouth, "pulled his pants down a little bit" above his knees, and then put his "inappropriate part in [her] mouth" and "told [her] to suck it."  (Tr. at 62, 64-65.)  He put one of his hands on the back of her head and used it to "bob[] [her] head back and forth, backward and forward." (Tr. at 65.)  She testified that his "inappropriate part" was used in the bathroom for peeing. (Tr. at 62, 71.)  No one else was in the basement at the time, and T.E. believed her mother was at the grocery store that morning.  She thought appellant stopped when her mom called him on the phone.

{¶ 8}   T.E. described an additional incident in the basement bedroom that occurred "around his birthday" in "March of 2019" when her mom was not at home and, T.E. believed was at the hospital.  (Tr. at 88.)  The prosecutor asked if her mom was at the hospital when T.E.'s brother and his wife were having a baby, and T.E. agreed.  According to T.E., she was

laying on the bed in the basement bedroom and appellant "tried to put [his private part] in" her private part, seemed "upset" and was "talking to [her] strong," and "would tell [her] to be quiet because [she] told him that it hurt." (Tr. at 90.) T.E. did not think his private part went inside of her private part. Appellant then told T.E. to "get on [her] knees" so she was kneeling on the floor while he was sitting on the edge of the bed, "told [her] to suck his private part again," and rubbed her chest "while [she] was sucking his private part." (Tr. at 90-93.)

{¶ 9} Other incidents occurred, according to T.E., during virtual schooling. T.E. testified that she needed an adult to sign her into an online test and asked appellant to do so in her mother's absence. Appellant brought a foldable chair, asked her to come toward him, hugged her, and started to rub her butt and kissed her on the lips. (Tr. at 78.) Appellant stopped when the online teacher came back onto the computer screen. During a separate incident, which T.E. believed occurred in March 2019, T.E. testified that appellant sat in a chair in her room while she was attempting to log into an online class, "pulled his private part out," and "started rubbing it up and down." (Tr. at 81.) T.E. told him to stop because she was about to turn on her computer microphone; appellant stopped and went to work.

{¶ 10} T.E. testified that appellant continued his inappropriate behavior when her mother left the house because her older brother and his wife were having the baby, which occurred in July 2019. (Tr. at 68, 98, 127.) On cross-examination, she testified that the incident could have occurred in June. (Tr. at 133.) According to T.E., while her brothers were upstairs, appellant took her to the downstairs bedroom, put her on the bed, pulled her pants and underwear down to her ankles, took off his clothes, "put his private part in between [her] legs," and used his hand to "rub[] his private part against [her] private part." (Tr. at 70-71.) She said it felt "rough" but did not think any part of his body when inside of her body during this incident. (Tr. at 72.) Appellant stopped when T.E.'s brother ran down the stairs and knocked on the bedroom door.

{¶ 11} According to T.E., there was a "big gap of time" where appellant stopped touching her, which T.E. believed was due to various people coming to stay at the house for periods of time. (Tr. at 98.) However, "near like February" of 2020, appellant "told [her] to start sucking his private part again." (Tr. at 99-100.) T.E. recalled an incident in March

2020 around one of her brother's March 5th birthday that "involve[d] him making [her] suck his private part and then he told [her] to get on top of him." (Tr. at 102-03, 141.) According to T.E., appellant was in the basement bedroom "laying down on the bed and then I'm laying on top of him. And he tells me to like rock back and forth while I'm sitting on him. * * * Over where his private part is." (Tr. at 103.) This occurred with their clothes off, and T.E. specified that appellant's private part touched her "butt." (Tr. at 108.) T.E. thought appellant stopped when her mother called on the phone. On cross-examination, T.E. clarified that this incident was different than the last occurrence she disclosed at Nationwide Children's Hospital.

{¶ 12} Lastly, T.E. described an incident that occurred in her bedroom, which she initially testified as occurring just prior to her mother "go[ing] back to the hospital because [her] brother's wife was actually having the baby at this time." (Tr. at 98.) T.E. was cleaning her closet while her mother was with her brothers in the basement, when appellant appeared in her room. T.E. testified that she believed appellant was upstairs to set up a television in her brother's room. While T.E. was on her knees, appellant "pull[ed] his private part out," "told [her] to suck on it," and "took one of his hands and started bobbing the back of [her] head backwards and forwards again." (Tr. at 97.) When her youngest brother could be heard running up the stairs, appellant put his private part back in his pants and "ran into [her] youngest brother's room." (Tr. at 98-99.) On cross-examination, T.E. agreed with defense counsel that this event occurred on March 9, 2020, and was the last event before she informed her mother, on March 10, 2020, that appellant was doing "inappropriate" things to her. (Tr. at 141-43.)

{¶ 13} Regarding her initial disclosure to her mother, T.E. testified that after that last incident in her bedroom, when appellant was at work and her mother was home and away from her brothers, she told her mother "what's been going on." (Tr. at 104.) The police arrived, and T.E. went to the hospital to have a check up and talk to someone there. According to T.E., she did not tell anyone about appellant's conduct sooner because she "was scared that he could do something horrible to us." (Tr. at 107.) T.E. admitted that when she first went to the hospital, she did not tell everything that occurred and said she held back because she was still scared. T.E. testified she would talk with her mom to "get the story straight," explaining her mother "helped her put [the story] together" by, for

example, providing dates she was not at the home. (Tr. at 115, 145-46.) However, T.J., T.E's mother, did not tell her what to say and told T.E. to tell the truth.

{¶ 14} The state then called T.J. to testify. T.J testified that she currently lives with four of her children—T.E. and her three brothers—at the same address where the alleged assaults occurred. The four children at home with T.J. attend online schools from home. T.J. testified that she has two additional children who are adults living outside of the home. Her oldest son and his wife had a baby on July 9, 2019 after a long labor; T.J. was at the hospital with them for a few days prior to the birth.

{¶ 15} T.J. testified that she met appellant in high school, had her first child with him at the age of 14, has known him for about 29 years, and has been in an "on-and-off" relationship with him. According to T.J., appellant is the biological father of three of her children, including T.E. In 2017, T.J. and appellant decided to move in together, and in February of 2019, they moved to her current residence, which she described as a one-story home with a finished basement. T.E. and her oldest brother each had their own bedroom on the first floor of the house, the two younger children shared a bedroom on the first floor, and T.J. and appellant slept in the basement bedroom. T.J. said they all would frequently sleep outside of their own bedrooms for "camp outs" and movie nights. (Tr. at 163.) During that time, T.J. had a baking business while appellant worked a consistent, Monday through Friday schedule outside of the home for a cookie company. She testified that although the family was very close and spent a lot of time together, there were periods of time when individuals were alone.

{¶ 16} T.J. testified that on March 10, 2020, T.E. approached T.J. in the basement when appellant was at work and her brothers were upstairs, asked T.J. if she could talk to her, and disclosed, "daddy is putting his inappropriate part in my mouth." (Tr. at 170.) T.J. explained that because T.E. was still young they had not talked about sex and used the term "inappropriate part" to refer to the areas of their bodies that someone else should not touch. (Tr. at 173.) According to T.J., when T.E. disclosed what appellant had done, T.E. made a specific hand gesture that T.J. recognized as appellant's mannerism for oral sex and, while describing the act, started crying. T.J. testified that T.E. stated the incident happened the previous night, when appellant was installing the boys' televisions, T.E. was cleaning her room, and T.J. and the boys were in the basement. T.J. testified that she was in shock, but

called her two older children and the police. The police took a report and told T.J. to take T.E. to Nationwide Children's Hospital to get an examination and to talk to a children's advocate.

{¶ 17} According to T.J., it was not until a couple of months later, in May 2020, that T.E. was ready to "tell [T.J.] everything." (Tr. at 184.) Through this conversation, which occurred at home, T.J. realized T.E. did not know the correct terminology for sexual acts: she referred to everything that happened as "sex" when the conduct she described was specifically oral sex as well as appellant "rubbing his penis in her vaginal area but no penetration." (Tr. at 185.) T.J. had "the sex talk" with T.E. at that time. (Tr. at 185.)

{¶ 18} After T.J. spoke with T.E. about the full extent of appellant's conduct, T.J. called a detective, who she believed worked through Nationwide Children's Hospital, to report the new information. According to T.J., listening to T.E. recount the various incidents to the detective prompted T.J. to recall situations that "were out of place" to her, such as T.E. taking more than usual time downstairs with appellant then being abnormally quiet upon her return, and appellant not answering his phone when T.J. was out of the house. (Tr. at 186-87.) For T.J., the events "began to line up" for her during this discourse. (Tr. at 187.)

{¶ 19} T.J. testified that, even before T.E.'s disclosure, her relationship with appellant was "rocky," lacked nearly all physical intimacy for a year, and was devoid of basic communication. (Tr. at 176, 198.) On cross-examination, T.J. agreed that she told police appellant was physically abusive to her and testified appellant had forced himself on her sexually. She filed for divorce in September 2020.

{¶ 20} The state's next witness was Heather Cassill, a trauma social worker and forensic interviewer at Nationwide Children's Hospital. Ms. Cassill was declared, without objection, an expert in forensic interviewing. Ms. Cassill testified that on March 10, 2020, she conducted a forensic interview with T.E. and prepared a report immediately after the interview, identified as State's Exhibit C. The prosecutor, on direct, asked Ms. Cassill if "referring to these records help refresh [her] recollection," and Ms. Cassill responded "[y]es." (Tr. at 245.) She confirmed her testimony was based both on her review of the report prior to testifying and her memory of the interview. (Tr. at 276.)

{¶ 21} Ms. Cassill testified that T.E. maintained eye contact, and was upset, but still communicated effectively and was easy to understand. Ms. Cassill asked T.E. opened-ended questions, and T.E. disclosed my "dad put her hands on her head and pushed her head back and forth and put his inappropriate part in her mouth." (Tr. at 248.) T.E. explained, "she was on her knees cleaning her closet when her dad came into the room, unbuckled his belt, unzipped his pants and took out his inappropriate part and put it in her mouth" while she was still on her knees. (Tr. at 252.) T.E. identified "inappropriate part" as "the part of the body that goes to the bathroom" and is "big and long." (Tr. at 249.) T.E. told Ms. Cassill her dad whispered so no one could hear what had happened. Following this testimony, the prosecutor asked Ms. Cassill to read a portion of her report verbatim, which described the sexual conduct. Defense counsel did not object. The passage read from the report generally matched Ms. Cassill's earlier testimony with additional details concerning how the conduct felt "horrible" and tasted "nasty," her dad telling her not to tell anybody, T.E. denying anyone but her dad showed her their private parts, and T.E.'s reasoning of why she disclosed to her mother. (Tr. at 262-65.)

{¶ 22} According to Ms. Cassill, T.E. stated this conduct happened one time and occurred the afternoon of March 9, 2020, the day prior to the interview. (Tr. at 252.) Ms. Cassill testified that each child reacts differently to sexual abuse and, in her experience, children do not typically disclose everything during the first interview but rather full disclosure could take months or years. Ms. Cassill testified that, generally speaking, younger and less developed children are less able to provide exact details of the sexual abuse or the timeline of events. Ms. Cassill noted that trauma can also impact a child's memory: some children "block out" abuse and do not remember what happened or are inhibited by stress and anxiety. (Tr. at 269.) Ms. Cassill agreed T.E. reported that the police had previously been called due to her parents arguing.

{¶ 23} After the conclusion of Ms. Cassill's testimony, the state called Logan Stover as a witness. Ms. Stover was declared an expert in conducting child sexual assault examinations. Ms. Stover testified that she is a Registered Nurse at Nationwide Children's Hospital and worked there as a Sexual Assault Nurse Examiner, otherwise known as a "SANE" nurse, from 2019 to 2021. (Tr. at 308.) She was the on-call SANE nurse on March 10, 2020, conducted a SANE exam on T.E. following the forensic interview with Ms.

Cassill, and prepared a report documenting the exam, which was identified as a section within State's Exhibit C. Ms. Stover testified that she conducted a comprehensive physical exam of T.E., including an anogenital exam. She did not find any bruising, bleeding, tearing, or otherwise abnormal findings. According to Ms. Stover, based on her training and experience conducting exams as well as accepted literature, "[o]nly five percent of children who have been through a traumatic assault exam, and this study, penis into vagina, only five percent of children have [an] abnormal exam -- meaning that there was bruising, bleeding, tearing. So 95 percent of exams are normal." (Tr. at 328.) Ms. Stover testified that in her expert opinion it is "[a]bsolutely" possible that a sexual assault could occur without any signs of trauma. (Tr. at 329.) Ms. Stover implemented the SANE kit, introduced as State's Exhibit B, which essentially provides a standardized means to collect potential evidence from various body areas of the alleged victim. The kit was taped, signed, and provided to the crime lab.

{¶ 24} The state's final witness was Lynndsay Simon, a Columbus Police Crime Laboratory DNA forensic scientist. Ms. Simon was declared, without objection, an expert in forensic DNA analysis. Ms. Simon testified that she analyzed the DNA evidence in this case received in the SANE kit and generated a report, dated April 20, 2020 and identified as State's Exhibit D, summarizing the results of testing performed on vaginal swabs, anal swabs, oral swabs, mons pubis swabs, the bilateral inner thigh swabs, and external mouth and face swabs. According to Ms. Simon, male DNA was detected in the anal swabs, the mons pubis swabs, and the bilateral inner thigh swabs. However, there "was not sufficient quantity of the male DNA in order for [the laboratory] to develop a profile," meaning they could not attribute the male DNA found on those three areas to a specific person. (Tr. at 367.) As a result, Ms. Simon testified that they stopped further analysis. According to Ms. Simon, insufficient DNA does not necessarily mean no contact occurred between a suspect and the victim.

{¶ 25} The state moved to admit exhibits that included photographs of the residence, the SANE kit and swabs, the medical record that included Ms. Cassell's report, and the DNA analysis report. The trial court, without objections by the defense, granted admission of those exhibits. At the conclusion of the state's case, the defense moved for acquittal pursuant to Crim.R. 29 arguing the state had failed to produce evidence with

respect to fellatio occurring on the dates stated in the indictment for Counts 1 and 4. The trial court overruled the motion. The defense did not call witnesses or admit any evidence, and both parties rested their case. In its closing argument, the defense implied T.E. testified appellant abused her at her mother's prompting, perhaps due to her parents' volatile relationship or to protect her brothers. The trial court then read the jury instructions, provided the jury with a copy of the instructions, and instructed the jury to follow them.

{¶ 26} Following deliberation, the jury found appellant guilty on all counts of the indictment. The trial court conducted a sentencing hearing on August 23, 2022, and imposed 15 years to life imprisonment on Count 1, 60 months imprisonment on Count 2, 60 months imprisonment on Count 3, 15 years to life imprisonment on Count 4, 60 months imprisonment on Count 5, and 10 years to life imprisonment on Count 6. The trial court ran Counts 1, 4, and 6 concurrent to each other, and Counts 2, 3, and 5 concurrent to each other but consecutive to Counts 1, 4, and 6 for an aggregate prison term of 20 years to life imprisonment with the possibility of parole after 20 years.

## II. ASSIGNMENTS OF ERROR

{¶ 27} Appellant assigns the following as trial court error:

> 1. The trial court erred by permitting inadmissible "bolstering" testimony evidence by [T.J.], Heather Cassill, and Logan Stover.
>
> 2. The convictions for rape (Count 1 and 4) are not supported by sufficient evidence and are contrary to the manifest weight of the evidence.
>
> 3. The trial court erred when it denied [J.E.]'s Rule 29 motion for acquittal as to Counts 1 and 4.

## III. LEGAL ANALYSIS

{¶ 28} Appellant focuses his appeal on testimony he asserts amounts to improper bolstering as well as the sufficiency and manifest weight of the evidence to support the rape convictions corresponding to Counts 1 and 4 of the complaint. As explained further below, by failing to cite direct opinion testimony or explain how any perceived error affected the outcome of his trial, appellant has not demonstrated plain error as to improper bolstering. Appellant's sufficiency and manifest weight of the evidence contentions likewise fail on this

record considering T.E. testified appellant had her perform oral sex on him twice in early March 2019, which supports both rape convictions in Counts 1 and 4, and she did so credibly.

### A. Improper Bolstering

{¶ 29} In his first assignment of error, appellant contends the trial court erred by permitting testimony from T.J., Heather Cassill, and Logan Stover that improperly "bolster[ed]" T.E.'s credibility in contravention to Evid.R. 608(A). (Appellant's Brief at 8, 10.) Generally, "[t]he admission of evidence is within the discretion of the trial court." *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 36. However, appellant did not object at trial to any of the testimony he now challenges, so we review each claim for plain error. *State v. Knuff*, ___ Ohio St.3d ___, 2024-Ohio-902, ¶ 117.

{¶ 30} Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the defendant's failure to bring those errors to the attention of the trial court. To show plain error, appellant must demonstrate that "an error occurred, that the error was obvious, and that there is 'a reasonable *probability* that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis sic.) *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

{¶ 31} "[T]he accused bears the burden of proof to demonstrate plain error on the record." *Rogers* at ¶ 22, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 16. "But even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have 'admonish[ed] courts to notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." ' " (Emphasis omitted.) *Rogers* at ¶ 23, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 32} Bolstering can be generally described as " 'an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury.' " *State v. Hernandez*, 8th Dist. No. 106577, 2018-Ohio-5031, ¶ 12, quoting *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir.1997). *See also Black's Law Dictionary* 176 (6th Ed.1990) (defining the term "bolstering" as "when one item of evidence

is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party").

{¶ 33} Opinion testimony bearing on the credibility of a witness may constitute improper bolstering. "Witnesses, whether experts or laymen, may not testify regarding their opinions on the credibility of other witnesses, because that infringes on the domain of the trier of fact." *Knuff* at ¶ 157. This rule still applies where the victim is a child. *State v. Denson*, 1st Dist. No. C-220208, 2023-Ohio-847, ¶ 25, citing *State v. Huff*, 145 Ohio App.3d 555, 561 (1st Dist.2001) and *State v. Boston*, 46 Ohio St.3d 108, 129 (1989) (discussing, in the context of a sexual-abuse case involving a child-victim, "it is the fact-finder who bears the burden of assessing the credibility and veracity of the witness").

{¶ 34} However, "this court has noted the careful distinction between direct opinion testimony about a child's veracity and indirect bolstering of a victim's credibility." *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 48, citing *State v. Cashin*, 10th Dist. No. 09AP-367, 2009-Ohio-6419, ¶ 20 and *State v. L.E.F.*, 10th Dist. No. 13AP-1042, 2014-Ohio-4585, ¶ 29. "Only statements that directly support[] the veracity of [the] witness are [generally] prohibited" while testimony serving as " 'additional support for the truth of the *facts testified* to by the child,' " potentially bolstering the child's credibility, is permissible. *Cashin* at ¶ 20; *Hughes* at ¶ 47, quoting *State v. Stowers*, 81 Ohio St.3d 260, 262-63 (1998). (Emphasis sic.)

{¶ 35} Opinion testimony directly supporting a witness's character for truthfulness is permitted by Ohio evidence rules, but under limited circumstances. Evid.R. 608(A) states, in pertinent part:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) The evidence may refer only to character for truthfulness or untruthfulness, and (2) Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

{¶ 36} Here, appellant asserts that T.E.'s testimony was "difficult to follow," filled with times she "did not remember," and failed to correlate with the date ranges identified in the amended indictment. (Appellant's Brief at 8-9.) Appellant also points to T.E.'s testimony about how her mother "helped [her] put it together." (Appellant's Brief at 9,

citing Tr. at 145-46.) Appellant thus contends the state was compelled to call additional witnesses—T.J., Ms. Cassill, and Ms. Stover—to improperly "bolster T.E.'s account." (Appellant's Brief at 10.)

### 1. T.J. overhearing T.E. talk to a detective

{¶ 37} Appellant contends T.J. bolstered T.E.'s credibility by testifying about a conversation T.E. had with a detective at Nationwide Children's Hospital when those statements were never presented during T.E.'s testimony and the detective was not called to testify. Appellant cites the following testimony by T.J. concerning the detective:

> A. And after I spoke with [T.E. in May 2020 about the full extent of appellant's conduct] -- I can't remember the detective's name. He had gave me his personal number. He worked at Children's. I contacted him and let him know what was going on and he asked me to bring her -- bring her in, and I did such.
>
> Q. So she was saying that she had been having sex and you had to correct her?
>
> A. Yes. It was not actual sex. It was oral and [appellant] rubbing his penis in her vaginal area but no penetration is what she stated at a point.
>
> Q. Would that have been then the sex talk that you had?
>
> A. Yes. That's when we finally had our first sex talk.
>
> * * *
>
> Q. What did you think whenever [T.E.] told you about the additional things that had been happening?
>
> A. When I sat with her -- I do believe the detective's name was Detective Hill. We sat with him at Children's and I listened to some of the details, and the times lined up in some of the actions that were going on during that time.
>
> Like, I remember different situations that had happened. And I guess what I'm trying to say is, I can't pinpoint if something she said struck a different nerve, but [describes an example of uncharacteristic conduct between appellant and T.E.].

(Tr. at 185-86.)

**{¶ 38}** Appellant asserts, "[t]his is hearsay and inadmissible testimony" and is "a[n] essential element that goes to T.E.'s credibility because [T.J.] describes that what T.E. stated to the detective gave [T.J.] reason to believe T.E. was being truthful." (Appellant's Brief at 12-13.) Appellant adds that T.J. had a motive to lie and bolster her daughter's testimony. Appellant cites to *United States v. Groysman*, 766 F.3d 147 (2d Cir.2014) as an example of a court reversing a conviction under plain error review where, "in a health care fraud case, an agent 'offered inadmissible bolstering testimony by testifying that certain transactions occurred, based only on his interviews of the cooperators' " and without personal knowledge to verify the transactions occurred. (Appellant's Brief at 11.) We disagree.

**{¶ 39}** T.J. essentially testified that she took T.E. to a detective after T.E. disclosed to her the full extent of appellant's conduct, implies that T.E. recounted that conduct to a detective, does not reference any statement made by the detective, and explains how that experience spurred T.J.'s own memories of events. T.J.'s testimony does not directly support the veracity of T.E. or otherwise implicate evidence in the form of "opinion or reputation" bearing on T.E.'s "credibility" to trigger Evid.R. 608(A)(2) and its limitations. *See Hernandez* at ¶ 16 (discussing that explanations of actions taken by parents in response to the victims' disclosure do not directly implicate the credibility of the sexual abuse allegations made by the victims); *Denson* at ¶ 26-27 (finding the testimony of witnesses regarding how the victim's consistency "lead to her credibility as a child" merely "indirectly bolstered the victim's credibility" but "did not directly support the child's veracity" to support plain error).

**{¶ 40}** Appellant's citation to *Groysman* does not persuade us otherwise. The *Groysman* decision in pertinent part examined "vouching" by a government agent. *Id*. at 157-58. However, unlike the instant case, the *Groysman* decision was centered on the special risk the government agent testifying on behalf of the state posed in terms of influencing the jury, since the jury could perceive the agent as having knowledge beyond that presented at trial. Moreover, the decision that plain error was warranted in *Groysman* was based on the government's concession of "a large number of erroneously admitted pieces of evidence" that were "were serious and central to the prosecution's strategy." *Id*.

at 162. Those conditions do not apply here, and we find *Groysman* distinguishable and unpersuasive.

{¶ 41} While appellant also argues this statement constitutes hearsay, he does not cite to or explain the application of Evid.R. 801—which defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Appellant has not identified a "statement" made by the detective, and whether T.J. testified to an out-of-court "statement" made by T.E.—one which describes appellant's conduct that was offered to prove the truth of T.E.'s assertion about appellant's conduct—is, at best, debatable and therefore not an "obvious error." Evid.R. 803(C); *McAlpin* at ¶ 66.

{¶ 42} Moreover, even if admission of T.J.'s testimony was improper, appellant did not establish that the error affected the outcome of the trial. T.E. testified and was subject to cross-examination and consequently the jury was able to hear the victim's testimony, observe her demeanor, and judge her credibility independent of the other witnesses' testimony. *Denson* at ¶ 24, 27; *Hughes* at ¶ 49. Overall, appellant has not demonstrated plain error with respect to T.J.'s testimony.

### 2. Ms. Cassill reading her report

{¶ 43} Appellant contends Ms. Cassill bolstered T.E.'s credibility by reading directly from her report, State's Exhibit C, when she did not need her memory to be refreshed. "This is hearsay and does not fall within an exception." (Appellant's Brief at 14.) Appellant cites to *United States v. Hill*, 749 F.3d 1250 (10th Cir.2014) for the proposition that plain error occurs when an expert FBI agent offered his opinion that the defendant was not being truthful, and to *Earls v. McCaughtry*, 379 F.3d 489 (7th Cir.2004) for the proposition that a social worker who testifies as an expert and states that "she believe[s] the child" amounts to inadmissible evidence and, concerning the defense attorney's failure to object, ineffective assistance of counsel. (Appellant's Brief at 13.)

{¶ 44} Appellant's position lacks merit. As previously explained, under Ohio law, "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Boston* at syllabus. However, unlike the cases cited by appellant, the report segment read by Ms. Cassill did not offer her expert opinion on T.E.'s truthfulness. The report segment at issue documented T.E. disclosing, in a "clear, coherent, and

consistent" manner that appellant put his "inappropriate part" in her mouth, which mirrored both Ms. Cassill's prior testimony and T.E.'s testimony. (Tr. at 263-65.) The challenged testimony expressed characteristics of how T.E. relayed her story without comment on the veracity of what T.E. disclosed and provided supplemental evidence in support of facts already testified to by T.E., which, under *Hughes*, does not constitute improper bolstering. *Hughes* at ¶ 47, citing *Stowers* at 262-63. While appellant invokes "hearsay" and the lack of exceptions in pursuing this argument in his brief, he again does not provide a corresponding argument supported by legal authority; we decline to do so on his behalf. *J.W. v. D.W.*, 10th Dist. No. 19AP-52, 2019-Ohio-4018, ¶ 55, citing *State v. Smith*, 9th Dist. No. 15AP0001n, 2017-Ohio-359, ¶ 22 (noting that it is not the duty of an appellate court to create an argument on an appellant's behalf). Moreover, the child victim testified in this case, subject to cross-examination, and Ms. Cassill's report was also admitted as an exhibit for the jury's reference.

{¶ 45} With these considerations in mind and on these facts, appellant has not demonstrated an error occurred, or that any such error would have affected the outcome of the trial. *See, e.g.*, *State v. Williams*, 12th Dist. No. CA2006-03-067, 2007-Ohio-2699, ¶ 34-35 (determining appellant had not demonstrated plain error where the cited statement did not relate to the victim's veracity or reputation and appellant did not prove the outcome of the trial would be different absent the cited statement).

### 3. Ms. Stover's reference to traumatic assault exam study

{¶ 46} Appellant contends Ms. Stover bolstered T.E.'s credibility by testifying "there were no abnormal findings" of the anogenital exam of T.E. and that "[o]nly five percent of children who have been through a traumatic assault exam, and this study, penis into vagina, * * * have an abnormal exam -- meaning there was bruising, bleeding, tearing. So 95 percent of exams are normal." (Tr. at 328.) To support his argument, appellant cites to *Snowden v. Singletary*, 135 F.3d 732 (11th Cir.1998) for the proposition that a court is required to set aside a conviction where an expert witness improperly testified that 99.5 percent of children tell the truth in child abuse cases, and the credibility of the child is the central issue of the case. Appellant further argues Mr. Stover's testimony was not relevant, as the allegations did not involve vaginal intercourse, and therefore was "impermissible testimony." (Appellant's Brief at 15.)

{¶ 47} As stated in our analysis for Ms. Cassill, "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Boston* at syllabus; *Denson* at ¶ 25. In applying this rule, this court has repeatedly recognized the distinction between direct opinion testimony about a child's veracity and indirect bolstering of a victim's credibility. *Hughes* at ¶ 47-48; *L.E.F.* at ¶ 29; *Cashin* at ¶ 20. Here, unlike the cases cited by appellant, Ms. Stover did not offer an opinion as to whether T.E. was telling the truth about her allegations against appellant. Instead, Ms. Stover's testimony attempted to explain why the lack of observable physical trauma to T.E.'s body did not mean she was not sexually abused. This does not amount to improper bolstering. *Hughes* at ¶ 48.

{¶ 48} We likewise disagree with appellant's contentions about relevance. Initially, appellant has not explained how his argument about relevance supports his assignment of error concerning improper bolstering. Regardless, his argument lacks merit. Relevant evidence is generally admissible, subject to exceptions, while irrelevant evidence is not admissible. Evid.R. 402. "Relevant evidence" is defined by rule as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In the testimony at issue, Ms. Stover informed the jury that, based on a study involving vaginal intercourse, there is a low percentage of children who have an abnormal traumatic assault exam. This testimony had some relevance to this case in that it tended to show the lack of abnormal findings during T.E.'s exam did not exclude sexual contact by appellant by less invasive means than vaginal intercourse. Appellant has also not demonstrated that admission of this evidence affected the outcome of the trial, since the jury could weigh Ms. Stover's testimony with due consideration of the nature of the allegations against appellant.

{¶ 49} Therefore, having reviewed appellant's contentions of improper bolstering concerning testimony from T.J., Ms. Cassill, and Ms. Stover, we find appellant has failed to demonstrate any obvious error occurred or that any such error would have affected the outcome of the trial to support plain error. Accordingly, appellant's first assignment of error is overruled.

**B. Sufficiency and Manifest Weight of the Evidence**

{¶ 50} In his second assignment of error, appellant contends the convictions for rape in Counts 1 and 4 are not supported by sufficient evidence and are against the manifest

weight of the evidence. Appellant does not challenge the sufficiency or manifest weight of the evidence in relation to his convictions for rape in Count 6 or for gross sexual imposition in Counts 2, 3, and 5. Consequently, we will not address those convictions.

{¶ 51} "[W]hether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial." *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 14, citing *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16; *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 7; *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jordan*, ___ Ohio St.3d ___, 2023-Ohio-3800, ¶ 16; *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds* as stated in *State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.

{¶ 52} "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus. "A verdict should not be disturbed on appeal unless reasonable minds could not reach the trier of fact's conclusion." *Jordan* at ¶ 16, citing *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 74. Whether there is legally sufficient evidence to sustain a verdict is a question of law. *Thompkins* at 386.

{¶ 53} "Challenges to the sufficiency of the evidence and the weight of the evidence involve distinct legal concepts and different standards of review." *Jordan* at ¶ 15, citing *Thompkins* at paragraph two of the syllabus. "A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it." *State v. Nicholson*, ___ Ohio St.3d ___, 2024-Ohio-604, ¶ 70. In contrast to a sufficiency challenge, a manifest weight claim "attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion." *Harris* at ¶ 15, citing *State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87. In reviewing whether a judgment is

against the manifest weight of the evidence, an appellate court "looks at the entire record and ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered." ' " *Jordan* at ¶ 17, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 54} "Although an appellate court reviews credibility when assessing the manifest weight of the evidence, the court must be mindful that determinations regarding witness testimony and the weight of testimony are primarily for the trier of fact." *State v. Jamii*, 10th Dist. No. 21AP-330, 2023-Ohio-4671, ¶ 47, citing *Harris* at ¶ 17, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The trier of fact was able " 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Harris* at ¶ 17, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). A conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of the events over the appellant's version of events. *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19.

{¶ 55} Overall, "[a] manifest-weight challenge should be sustained ' "only in the exceptional case in which the evidence weighs heavily against the conviction." ' " *Nicholson* at ¶ 71, quoting *Thompkins* at 387, quoting *Martin* at 175. Further, reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three judges on the court of appeals panel reviewing the case. *Harris* at ¶ 18, citing Article IV, Section 3(B)(3) of the Ohio Constitution; *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

{¶ 56} Here, the relevant counts in the indictment, as amended, state:

> Count 1 – Rape pursuant to R.C. 2907.02, committed on or about March 9 through 11, 2019, by way of fellatio with T.E., who was less than thirteen years of age, to wit: nine years old.

> Count 4 – Rape pursuant to R.C. 2907.02, committed on or about March 12, 2019, by way of fellatio with T.E., who was less than thirteen years of age, to wit: nine years old.

{¶ 57} The crime of rape, as set forth in the applicable part of R.C. 2907.02(A)(1)(b), declares, "No person shall engage in sexual conduct with another * * * when any of the following applies: * * * The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."  Under R.C. 2907.01(A), "sexual conduct" includes "fellatio," which is not defined by the Revised Code.  The trial court instructions, which appellant adopts in his appellate analysis, defines fellatio as "a sexual act committed with the male sex organ and the mouth."  (Tr. at 457.)  *See also In re M.D.*, 38 Ohio St.3d 149, 152 (1988) and Ohio Jury Instructions, CR Section 507.02(A)(1) (Rev. Jan. 22, 2011) at 5 (defining "fellatio" as "the practice of obtaining sexual satisfaction by oral stimulation of the penis").

{¶ 58} Initially, we note appellant has not presented an assignment of error challenging the trial court's decision to amend the indictment over defense counsel's objection, and likewise did not provide an argument supported by legal authority to challenge that amendment.  Appellant's only argument here is primarily one of sufficiency: that "T.E. only provided testimony that 'sexual conduct' occurred on or about March 9, 10, 11, or 12" of 2019 and "no other evidence suggests more than one instance of 'sexual conduct' occurred during this timeframe."  (Appellant's Brief at 18.)  Therefore, according to appellant, the jury improperly found appellant guilty of two counts of rape within this time frame and asserts the conviction for Count 1 should be reversed and the matter remanded for resentencing.  We disagree.

{¶ 59} Initially, the precise date and time a rape occurs is ordinarily not an essential element of the crime.  *State v. Armengau*, 10th Dist. No. 18AP-276, 2019-Ohio-1010, ¶ 13, citing *State v. Reinhardt*, 10th Dist. No. 04AP-116, 2004-Ohio-6443, ¶ 20; R.C. 2907.02.  This case does not include, for example, a challenge to the victim's age to support a conviction under R.C. 2907.02(A)(1)(b).  Where the exact date and time of an offense are not material elements of a crime, it is sufficient to prove that the alleged offense occurred "at or about the time charged."  *Reinhardt* at ¶ 20, citing *State v. Madden*, 15 Ohio App.3d 130, 131 (1984).  The indictment here includes similar "on or about" language.

{¶ 60} Moreover, this case involves the testimony of a child, which necessarily requires more leeway in establishing when a crime occurred.  "It is well established that, particularly in cases involving sexual misconduct with a child, the precise times

and dates of the alleged offense or offenses oftentimes cannot be determined with specificity." *State v. Daniel*, 97 Ohio App.3d 548, 556-57 (10th Dist.1994), citing *State v. Barnecut*, 44 Ohio App.3d 149, 151 (5th Dist.1988). Therefore, when relying on the memory of a child, "reasonable allowances for inexact dates and times must be made." *State v. Collinsworth*, 12th Dist. No. CA2003-10-012, 2004-Ohio-5902, ¶ 23. This is especially true where the crimes involved a repeated course of conduct over an extended period and, even more so, where the accused and the child are related or reside in the same household. *State v. T.E.H.*, 10th Dist. No. 16AP-384, 2017-Ohio-4140, ¶ 61; *State v. Czech*, 8th Dist. No. 100900, 2015-Ohio-1536, ¶ 14. Therefore, as a general rule, the state does not need to prove an offense occurred on an exact date in presenting a case to support alleged sexual misconduct involving a child. *State v. K.A.C.*, 10th Dist. No. 23AP-86, 2024-Ohio-1139, ¶ 68; *T.E.H.* at ¶ 61.

{¶ 61} With these considerations in mind, we reject appellant's contention that there was insufficient evidence to prove two rapes occurred during the time periods specified in Counts 1 and 4 of the indictment. In this case, T.E. testified to a course of conduct by appellant behaving in a sexual manner toward her beginning around late February 2019 through about the time of the birth of her eldest brother's child on July 9, 2019 and then resuming in February 2020 until March 9, 2020, the day before her disclosure to her mother. Pertinent to the convictions challenged by appellant, T.E. provided details about two times in the first half of 2019 where appellant had her perform oral sex on him.

{¶ 62} In the first incident, while they were in the basement sitting room, appellant told T.E. to get on her knees and open her mouth, put his "inappropriate part in her mouth," "told [her] to suck it," and put his hand on the back of her head to then move her head back and forth. (Tr. at 62, 64-65.) She did not know the exact date of this act but believed it occurred "[c]loser to [her] second oldest brother's birthday," which she stated is March 5th. (Tr. at 61.) Appellant concedes this incident supported one of the 2019 rape convictions. (Appellant's Brief at 20.)

{¶ 63} In the second incident, while they were in the basement bedroom, appellant had T.E. get on her knees while he sat on the edge of the bed and "told [her] to suck his private part again," which she did. (Tr. at 90-91, 93.) T.E. testified that this event occurred

"around his birthday" in "March of 2019," which contextually appears to refer to appellant's March 11th birthday. (Tr. at 88.) T.E. also mentioned she thought her mom was at the hospital during this incident, and the prosecutor asked if her mom was at the hospital when T.E.'s brother and his wife were having a baby; T.E. agreed. (Tr. at 88-89.) It was later established that T.E.'s brother and his wife had a baby on July 9, 2019. We note that, on cross-examination, defense council omitted this incident from the timeline of events counsel was attempting to establish.

{¶ 64} Our review of the testimony in this case shows T.E. did testify that appellant had her perform oral sex on him twice at the beginning of March 2019. Contrary to appellant's argument, T.E.'s testimony, if believed, is sufficient to establish rape by fellatio "on or about" March 9 through 11, 2019 and March 12, 2019. (Nov. 6, 2020 Indictment at 1-2; Tr. at 6-9.) Overall, the evidence in this case, when viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of rape proven beyond a reasonable doubt for both Counts 1 and 4. *Jordan* at ¶ 16; *Jenks* at paragraph two of the syllabus.

{¶ 65} Appellant's convictions on Counts 1 and 4 are additionally not against the manifest weight of the evidence due to T.E.'s testimony regarding when the acts of fellatio occurred. As provided above, T.E. testified appellant had her perform oral sex on him around the time of her brother's March 5th birthday (basement sitting room incident) and appellant's March 11th birthday (basement bedroom incident) in 2019. While T.E. did at one point agree with the prosecutor that the basement bedroom fellatio incident occurred around the time of the birth of her brother's child in early July, the jury could have reasonably concluded the prosecutor mistook when the child was born and decided to credit T.E.'s initial testimony of timing. It is the province of the jury to "consider conflicting testimony from a witness in determining credibility and the persuasiveness of the account by either discounting or otherwise resolving the discrepancies." *State v. O.E.P.-T.*, 10th Dist. No. 21AP-500, 2023-Ohio-2035, ¶ 131, citing *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 34. *State v. Mullins*, 10th Dist. No. 16AP-236, 2016-Ohio-8347, ¶ 39 ("The finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact."). While at times T.E. was not precise regarding the dates of the

conduct and counsel for both parties occasionally added to the confusion, precision is not a requirement in this context, and the jury additionally heard Ms. Cassill testify that, in her experience, children may have trouble providing exact details of the sexual abuse or the timeline of events due to their age and response to trauma.

{¶ 66} Moreover, T.E.'s testimony, reviewed as a whole, is detailed and specific about conduct she remembered happening—and not happening—exhibiting restraint that strengthened her credibility. T.E.'s credibility was additionally reinforced by testimony from the other witnesses. For example, her mother and Ms. Cassill testified that T.E. initially disclosed behavior in March 2020 consistent with the conduct alleged in Counts 1 and 4.

{¶ 67} Having reviewed the entire record and weighed the evidence and all reasonable inferences, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that the one of the 2019 rape convictions must be reversed. *Jordan* at ¶ 17; *Thompkins* at 387. Accordingly, appellant's second assignment of error is overruled.

## C. Crim.R. 29 Motion for Acquittal

{¶ 68} Appellant's third assignment of error challenges the trial court's denial of appellant's Crim.R 29 motion for acquittal as to the Counts 1 and 4 rape charges. Specifically, appellant again asserts the testimony provided by T.E. only described one event "ris[ing] to the level of rape during th[e] general timeframe of on or about March 9 through 11, and March 12, 2019" as stated in the indictment. (Appellant's Brief at 20.) He therefore contends the trial court erred in not dismissing Count 1 upon his Crim.R. 29 motion for acquittal.

{¶ 69} Crim.R. 29(A) provides that the court, "on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "Review of the denial of a Crim.R. 29 motion and the sufficiency of the evidence apply the same standard." *State v. Abdullahi*, 10th Dist. No. 21AP-350, 2024-Ohio-418, ¶ 22, citing *State v. Fugate*, 10th Dist. No. 12AP-194, 2013-Ohio-79, ¶ 5.

**{¶ 70}** In resolving appellant's second assignment of error, we determined that appellant's sufficiency of the evidence argument concerning Counts 1 and 4 lacked merit. Contrary to appellant's position, T.E.'s testimony, when viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of rape proven beyond a reasonable doubt for both Counts 1 and 4. *Jordan* at ¶ 16; *Jenks* at paragraph two of the syllabus.

**{¶ 71}** Accordingly, appellant's third assignment of error is overruled.

## V. CONCLUSION

**{¶ 72}** Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and EDELSTEIN, JJ., concur.

_____